# IN THE SUPREME COURT OF TENNESSEE
## AT JACKSON
### November 9, 2005 Session

## STATE OF TENNESSEE v. STEPHEN LYNN HUGUELEY

**Automatic Appeal from the Court of Criminal Appeals**
**Circuit Court for Hardeman County**
**No. 6665      Jon Kerry Blackwood, Judge**

---

### No. W2004-00057-SC-DDT-DD - Filed March 15, 2006

---

Defendant, Stephen Lynn Hugueley, was convicted by a jury of one count of first degree premeditated murder. During the penalty phase of the trial, the jury found four aggravating circumstances: (1) Defendant was previously convicted of one or more felonies whose statutory elements involved the use of violence to the person; (2) the murder was especially heinous, atrocious, or cruel in that it involved torture or serious physical abuse beyond that necessary to produce death; (3) Defendant committed the murder while he was in a place of lawful confinement; and (4) the victim was a corrections employee. See Tenn. Code Ann. § 39-13-204(i)(2), (5), (8), (9) (Supp. 1999). Additionally, the jury determined that the evidence of these aggravating circumstances outweighed the evidence of mitigating circumstances beyond a reasonable doubt. Id. at (g)(1). The jury thereupon sentenced Defendant to death. The Court of Criminal Appeals affirmed the conviction and the death sentence.

After the case was docketed in this Court, we entered an order identifying several issues for oral argument.[1] We now hold as follows: (1) the trial court did not commit reversible error in concluding that Defendant failed to establish purposeful discrimination by the prosecution in its exercise of peremptory challenges in violation of Batson v. Kentucky and J.E.B. v. Alabama ex rel. T.B.; (2) the trial court did not commit reversible error in refusing to dismiss prospective juror Watkins for cause; and (3) the death sentence is valid under this Court's mandatory review pursuant to Tennessee Code Annotated section 39-13-206(c)(1) (2003). We agree with the Court of Criminal Appeals' conclusions with respect to the remaining issues, the relevant portions of which are included in the appendix to this opinion. Accordingly, the Court of Criminal Appeals' judgment is affirmed.

**Tenn. Code Ann. § 39-13-206(a)(1); Judgment of the Court of Criminal Appeals Affirmed**

---

[1] "Prior to the setting of oral argument, the Court shall review the record and briefs and consider all errors assigned. The Court may enter an order designating those issues it wishes addressed at oral argument." Tenn. Sup. Ct. R. 12.2.

CORNELIA A. CLARK, J., delivered the opinion of the court, in which WILLIAM M. BARKER, CJ., AND E. RILEY ANDERSON, AND JANICE M. HOLDER, JJ., joined. ADOLPHO A. BIRCH, JR., J., filed a concurring and dissenting opinion.

F. Michie Gibson, Jr. and T. J. Cross-Jones, Nashville, Tennessee, for the appellant, Stephen Lynn Hugueley.

Paul G. Summers, Attorney General and Reporter; Michael E. Moore, Solicitor General; Michelle Chapman McIntyre and Michael Markham, Assistant Attorneys General; Elizabeth T. Rice, District Attorney General; Terry D. Dycus and Colin Campbell, Assistant District Attorneys General, for the appellee, State of Tennessee.

**OPINION**

**FACTUAL BACKGROUND**

**GUILT PHASE**

The evidence adduced at Defendant's trial established that, on January 17, 2002, Defendant was an inmate at the Hardeman County Correctional Facility, where he was housed in the "F" pod. That day, correctional counselor Delbert Steed entered the "F" pod in order to counsel inmates. Mr. Steed was sitting at a table when Defendant approached from behind and began stabbing Mr. Steed with a homemade weapon. Defendant stabbed Mr. Steed a total of thirty-six times. Defendant did not cease stabbing the victim until the handle of his homemade weapon broke off. Once Defendant was unable to continue using his weapon, he lay down on the floor of the pod and permitted other correctional officers to restrain and remove him. The victim was recovered with the sharpened portion of the weapon still embedded in his back, and he was transported to the infirmary.

Mary Harris testified that she was working in the control room from which she could view the activity occurring in the pod. She observed Defendant approach the victim from behind and begin stabbing him. Upon witnessing Defendant's attack on Mr. Steed, she called for assistance. Another female officer opened the door to the pod and told Defendant to stop. At that, Defendant rose and started toward the officer "with the knife drawn back like he was going to stab her." The officer closed the door, and Defendant returned to the victim, recommencing his attack. Ms. Harris testified further that Officer Donald Watkins entered the pod and told Defendant to stop. According to Ms. Harris, Defendant stabbed the victim once or twice more and then stopped when the handle on the weapon broke. At that point, Defendant allowed himself to be taken into custody.

Donald Watkins testified that he is a Senior Correctional Officer at the Hardeman County Correctional Facility. He responded to Ms. Harris' call for assistance. As he looked through the door into the pod, he saw Defendant kneeling down next to the victim. When he saw Defendant stab the victim with a homemade weapon, he entered the pod shouting, "Drop your weapon! Drop your weapon!" Mr. Watkins stated that Defendant complied immediately and lay face down on the floor.

Mr. Watkins called for medical assistance, and when he heard the victim making a groaning noise "like he was in pain," Mr. Watkins tried to reassure the victim that help was coming.

Pursuant to his employment by the Tennessee Department of Correction as an Internal Affairs Investigator, Mr. Joseph Vernon reported to the crime scene where he collected evidence and took photographs. Mr. Vernon was present when the murder weapon was removed from Mr. Steed's body. He described the weapon as a "quarter inch rod that ha[d] been sharpened to a very fine point" on one end. Mr. Vernon stated that the point was "razor sharp." The weapon measured approximately eleven inches long. The handle of the weapon was a "Magic Marker" pen.

Mr. Don Dunaway, also an Internal Affairs Investigator with the Tennessee Department of Correction, interviewed Defendant after the killing. After being informed of his rights and agreeing to waive them, Defendant gave Mr. Dunaway a lengthy statement in which he described his intense dislike of the victim. Mr. Dunaway testified about the statement. Additionally, an audio tape of Defendant's statement was played for the jury, and a transcript of the tape was provided. Defendant described numerous conflicts and confrontations that he had had with Mr. Steed in his capacity as a correctional officer. Defendant claimed that Mr. Steed had threatened to write him up and told Defendant that he was "friends with these gangs around here! They like me! They love me! . . . you ain't nothing!"

Defendant killed the victim on a Thursday. Defendant told Mr. Dunaway that he began thinking about killing the victim on the previous Monday. On that day, he got his weapon but then decided to "just . . . leave it alone." Defendant described to Mr. Dunaway what then occurred on Thursday, while Mr. Steed was in the pod:

> I started to walk up and say something to him, and one of the little gang members that he talked to a lot there, run up and set down at the table and started talkin' to him. And I stood over to the side for a few minutes, and he looked at me, and he just shook his head . . . just turned around and faced the other direction. And I said, "F[--]k this!" And I went to the house, and got my damn knife and packed my property up real quick . . . throwed my s[--]t in a box and un-done my TV, and set it over to the side, and went and killed his ass! It was that plain and simple.

Defendant admitted to Mr. Dunaway that he intended to kill the victim by stabbing "the most vital organs first . . . the heart and the lung."

Mr. Dunaway testified that in May of 2003, Defendant wrote a letter to the district attorney. Mr. Dunaway obtained this letter and subsequently verified with Defendant that he had written and signed it. This letter was admitted into evidence and states, in pertinent part, the following: "I did with malicious intent premeditatedly murder Delbert Steed, and as indicated in my statement to Internal Affairs, I have no regret or remorse for this crime and I fully intended to kill others that day but was unable to do so because the handle on my weapon broke."

Dr. O'Brian Clary Smith testified as an expert in the field of forensic pathology about the autopsy to the victim. Dr. Smith removed the murder weapon from the victim's back. He stated that the victim's cause of death was "[m]ultiple stab wounds, thirty-six." Twelve of these wounds were lethal. Dr. Smith testified that there were ten wounds to the victim's chest area, three of which were fatal. There were fourteen wounds to the victim's back area, nine of which were fatal. Additionally, there was one wound to the victim's abdomen and eleven wounds to the victim's left arm.

Defendant testified at trial. He stated about his attack on the victim:

> I was stabbing Counselor Steed. He was laying on the floor, stomach down. I was trying to drive it plumb through and hit the concrete below him. That was my intentions. I heard the door pop behind me. I turned around and it was the Watkins guy that testified yesterday, and a little girl named Perry. When I seen them, I took one and a half steps toward them. At that time, I still had the weapon in my hand. And they said, "He's got a knife," and slammed the door.
> And they stood outside the door while I stabbed the man while he was laying on the floor, face down, I stabbed him about eight more times trying to run it plumb through him. They didn't come in until when I drawed back going to hit him again, I didn't see nothing but a piece of pen, Magic Marker sticking out of my hand. . . .

At that point, Defendant threw the weapon handle away and lay down on the floor. Defendant also testified about a grievance he had filed in which he set forth various complaints about the victim and the victim's supervisor. He explained that he had made numerous cell change requests and requests to be placed in the anger management program, "all in an effort to get away from Counselor Steed" and the unit manager. Defendant stated that the victim "had a smart ass mouth" which was the source of their "problem." Defendant continued: "He had a habit of shooting his mouth off to inmates, threatening them, and I wasn't going to stand for it in any way, shape or form."

On cross-examination, Defendant stated, "In the world I live in, you die for disrespect. It should apply to both employee and inmate." He explained that he had made the murder weapon from a piece of metal removed from a laundry cart. He used sandpaper from a belt sander to sharpen the point. He stated that he would not have quit stabbing the victim if the handle of the weapon had not broken off. He admitted that he aimed for the victim's vital organs.

Defendant acknowledged that his actions in killing the victim were both intentional and premeditated. He also acknowledged that during his conversations with defense counsel he had consistently maintained that he wanted the death penalty.

Upon considering this proof, the jury returned a verdict of guilty on Defendant's charge of first degree premeditated murder.

**PENALTY PHASE**

During the penalty phase of Defendant's trial, the State introduced by stipulation three certified judgments of conviction against Defendant. These judgments established that Defendant was convicted in 1986 of first degree murder; in 1992 of first degree murder; and in 1998 of attempt to commit first degree murder.

Dr. Smith testified and described the instant murder weapon as one that would cause pain "on a living, awake individual." He stated that the manner of death in this case would qualify as "overkill." Dr. Smith explained that the term "overkill" was used in forensic pathology to mean that "there was excessive injury done to the body far in excess of what would be necessary to cause death."

Willie Leroy Steed, the victim's older brother, testified about all of the assistance that the victim had provided to their family members prior to his murder. Mr. Steed stated that their brother, Paul, who is handicapped, had been able to live unassisted prior to the murder. After the murder, because the victim was no longer able to help with Paul's needs, Paul had to move to a supervised facility. Their sister, Barbara, was also adversely affected by the murder, having since become "very nervous," a condition for which she requires medical help. She also now requires the use of a walking cane. Their sister, Onita, suffered a "nervous breakdown" as a result of the murder and has visions of the victim at night. Their sister, Margaret, suffered a heart attack after the murder and was subsequently moved to a nursing home. On cross-examination, Mr. Steed acknowledged that he and another brother, as executors of the victim's estate, had filed a lawsuit against "CCA[2] and Hardeman County" alleging negligence with regard to the victim's death.

In a colloquy with the court, Defendant waived his right to present any mitigating evidence.

At the close of proof, the trial court instructed the jury on four statutory aggravating circumstances as follows:[3]

> Tennessee law provides that no sentence of death or sentence of imprisonment for life without possibility of parole shall be imposed by a jury but upon a unanimous finding that the state has proven beyond a reasonable doubt the existence of one (1) or more of the statutory aggravating circumstances, which shall be limited to the following:
> [(2) the defendant was previously convicted of one (1) or more felonies, other than the present charge, the statutory elements of which involve the use of violence to the

---

[2]We take judicial notice of the fact that the Hardeman County Correctional Facility is managed by Corrections Corporation of America.

[3]The trial court's instructions to the jury were not transcribed. This Court is relying upon the written instructions included with the jury's verdict form contained in the technical record.

person.  The state is relying upon the crime(s) of murder & att. [sic] murder, which is (are) a felony involving the use of violence to the person[;]

[(5)  The murder was especially heinous, atrocious, or cruel in that it involved torture or serious physical abuse beyond that necessary to produce death[;]

[(8)  The murder was committed by the defendant while [he] was in lawful custody or in a place of lawful confinement[;]

[(9)  The murder was committed against any law enforcement officer, corrections official, corrections employee, engaged in the performance of official duties.

"HEINOUS" means grossly wicked or reprehensible, abominable; odious; vile.

"ATROCIOUS" means extremely evil or cruel; monstrous; exceptionally bad; abominable.

See Tenn. Code Ann. § 39-13-204(i)(2), (5), (8), (9) (Supp. 1999).  As to mitigating circumstances, the trial court instructed the jury as follows:

Tennessee law provides that in arriving at the punishment, the jury shall consider as previously indicated, any mitigating circumstances raised by the proof[.]

Any other mitigating factor which is raised by the evidence produced by either the prosecution or defense at either the guilt or sentencing hearing; that is, you shall consider any aspect of the defendant's character or record, or any aspect of the circumstances of the offense favorable to the defendant which is supported by the evidence.

The defendant does not have the burden of proving a mitigating circumstance. If there is some evidence that a mitigating circumstance exists, then the burden of proof is upon the state to prove, beyond a reasonable doubt, that the aggravating circumstance or circumstances outweigh any mitigating circumstance or circumstances.

There is no requirement of jury unanimity as to any particular mitigating circumstance, or that you agree on the same mitigating circumstance.

See id. at (e)(1).

Following deliberations, the jury found that the State had proven all four aggravating circumstances beyond a reasonable doubt.  The jury further determined that the aggravating circumstances outweighed any mitigating circumstances beyond a reasonable doubt.  The jury sentenced Defendant to death for his first degree premeditated murder of Delbert Steed.

On appeal, the Court of Criminal Appeals affirmed Defendant's conviction and death sentence.  Defendant's appeal was then automatically docketed in this Court.

## ANALYSIS

### I.  Jury Selection Issues

### A.  Batson Claims

### 1.  Allegedly Race-based Peremptory Challenges

We first address Defendant's contention that his constitutional rights were violated by the prosecution's exercise of peremptory challenges to certain potential jurors.  Defendant asserts in his appellate brief that the State struck eight jurors on the basis of their race in violation of his equal protection rights under Batson v.  Kentucky, 476 U.S. 79 (1986).  The State responds that no violation occurred because the basis of each challenge was race-neutral.

In Batson, the United States Supreme Court held that "the Equal Protection Clause [of the United States Constitution] forbids the prosecutor to challenge potential jurors solely on account of their race . . . ."  Id. at 89.  The Court crafted a three-pronged analysis for determining whether the suspect challenges were impermissibly based on the potential juror's race.  At the outset, the defendant must establish a prima facie case of purposeful discrimination.[4]  In doing so, the defendant may rely "solely on evidence concerning the prosecutor's exercise of peremptory challenges at the defendant's trial."  Id. at 96.  That is, the defendant need not prove a past pattern of racially discriminatory jury selection practices by the prosecution.  Id. at 92-93; cf. Swain v. Alabama, 380 U.S. 202, 223 (1965), overruled in part by Batson, 476 U.S. at 91-92  (recognizing that an inference of purposeful discrimination may be raised on proof that the prosecution struck qualified blacks "in case after case, whatever the circumstances, whatever the crime and whoever the defendant or the victim may be. . .").  Once the defendant makes out a prima facie case, the State has the burden of producing a neutral explanation for its challenge.  Batson, 476 U.S. at 97.  This explanation must be a clear and reasonably specific account of the prosecutor's legitimate reasons for exercising the challenge.  Id. at 98 n.20.  However, the race or gender neutral explanation need not be persuasive, or even plausible.  Purkett v. Elem, 514 U.S. 765, 767-68 (1995).  "'Unless a discriminatory intent is inherent in the prosecutor's explanation, the reason offered will be deemed race neutral.'"  Id. at 768 (quoting Hernandez v. New York, 500 U.S. 352, 360 (1991) (plurality opinion)).  If a race-neutral explanation is provided, the trial court must then determine, from all of the circumstances, whether the defendant has established purposeful discrimination.  Batson, 476 U.S. at 98.  The trial court may not simply accept a proffered race-neutral reason at face value but must examine the prosecutor's challenges in context to ensure that the reason is not merely pretextual.  See Miller-El v. Dretke, __ U.S. __, 125 S. Ct. 2317 (2005) ("Miller-El II").  In that case, the Court reiterated that "the rule in Batson provides an opportunity to the prosecutor to give the reason for striking the juror, and it requires the judge to assess the plausibility of that reason in light of all evidence with a bearing

---

[4]The Supreme Court subsequently ruled that the State may also lodge a Batson objection upon perceived discriminatory peremptory challenges by the defendant.  See Georgia v. McCollum, 505 U.S. 42, 59 (1992).  We refer here to the objecting party as "defendant" for ease of reading.

on it." Id. at 2331. If the trial court determines that the proffered reason is merely pretextual and that a racial motive is in fact behind the challenge, the juror may not be excluded. Woodson v. Porter Brown Limestone Co., 916 S.W.2d 896, 903 (Tenn. 1996).

As this Court has noted in the past, "determination of the prosecutor's discriminatory intent or lack thereof turns largely on the evaluation of the prosecutor's credibility, of which the attorney's demeanor is often the best evidence." State v. Smith, 893 S.W.2d 908, 914 (Tenn. 1994). We accord a trial court's findings in this regard great deference and will not set them aside unless clearly erroneous. Woodson, 916 S.W.2d at 906; see also Batson, 476 U.S. at 98 n.21 ("Since the trial judge's findings in [this] context . . . largely will turn on evaluation of credibility, a reviewing court ordinarily should give those findings great deference."). For this reason, "[t]he trial judge must carefully articulate specific reasons for each finding on the record, i.e., whether a prima facie case has been established; whether a neutral explanation has been given; and whether the totality of the circumstances support a finding of purposeful discrimination." Woodson, 916 S.W.2d at 906.

In this case, defense counsel objected at trial to the State's peremptory challenge of five potential jurors: Ms. Ida Ferguson, Mr. Everette Woods, Ms. Phyllis McKinnie, Ms. Willie Heard, and Ms. Helen Pruitt. The record indicates that all of these persons are African-American; Defendant is Caucasian.[5] Before this Court, Defendant alleges that the prosecution improperly excluded eight African-American venire persons,[6] adding Mr. Johnny Hudson, Ms. Gertrude Gibbs, and Ms. Linda Pirtle. Defendant's argument as to these additional three venire persons is waived because Defendant failed to object to the State's challenges to these three persons in a timely fashion. See State v. Peck, 719 S.W.2d 553, 555 (Tenn. Crim. App. 1986). This Court is not bound to grant relief to a party who fails to take "whatever action was reasonably available to prevent or nullify the harmful effect of an error." Tenn. R. App. P. 36(a). In this case, Defendant had the opportunity at trial to object to each and every one of the State's peremptory challenges, thereby giving the trial court the opportunity to assess the constitutionality of the State's choices. Defendant did not do so with respect to Mr. Hudson, Ms. Gibbs, and Ms. Pirtle. Accordingly, he will not now be heard to complain about the State's challenges to these three venire persons. See State v. Johnson, 980 S.W.2d 414, 419 (Tenn. Crim. App. 1998). We will, therefore, limit our examination of Defendant's race-based Batson claim to the five venire persons previously named.

### Ida Ferguson

During voir dire questioning by the State, Ms. Ferguson acknowledged that she had a religious belief against the death penalty, but stated she could "follow the law." She acknowledged having stated on her jury questionnaire that she felt a sentence of life without parole was "adequate" and that she would not want to consider the death penalty, but reiterated that she "ha[d] to obey the

---

[5]Defendant's race is indicated in the Report of Trial Judge in Capital Cases prepared and submitted by the trial court pursuant to Tennessee Supreme Court Rule 12.1.

[6]In Powers v. Ohio, 499 U.S. 400, 415-16 (1991), the Supreme Court determined that the defendant and the excluded juror need not be of the same race in order for there to be an equal protection claim.

laws of the land." In response to subsequent questions by defense counsel, Ms. Ferguson stated that she "would have to have very hard evidence to consider" imposing either life in prison with no opportunity for parole or the death penalty. The State thereafter used one of its peremptory challenges to remove Ms. Ferguson from the panel. Upon defense counsel's <u>Batson</u> objection, the prosecutor referred to Ms. Ferguson's response in the jury questionnaire to the question, "do you have any personal, moral or religious beliefs against imposition of the death penalty?" According to the prosecutor, Ms. Ferguson had answered, "yes," with the explanation that she believed that a "life sentence without parole is adequate, vengeance is mine said the Lord." The prosecutor maintained that "the State is striking her based upon the answer to that question." The trial court thereupon overruled defense counsel's <u>Batson</u> objection.

### Everette Woods

The State asked Mr. Woods during voir dire if he believed in the death penalty. Mr. Woods responded that he did not believe in it. He stated further, however, that he could follow the law and sign the death warrant if Defendant was guilty. After the State peremptorily challenged Mr. Woods, defense counsel lodged a <u>Batson</u> objection. The prosecutor responded that Mr. Woods had indicated on his jury questionnaire that he did not believe in the death penalty. Defense counsel claimed that Mr. Woods had been rehabilitated during voir dire. The trial court stated nothing on the record but excused Mr. Woods.

### Phyllis McKinnie

Defense counsel objected to the State's challenge of Ms. McKinnie, stating that she was the sixth African-American struck by the State. The State had lodged five peremptory challenges prior to challenging Ms. McKinnie. The State referred to Ms. McKinnie's statement on her questionnaire that she "just [does not] want to be a part of putting any person to death because it could turn out to be an innocent person after you have put him or her to death." The prosecutor also averred that "all six of the individuals [he] struck [had] indicated on the back of their jury questionnaires they would have a problem with the death penalty." Defense counsel claimed that Ms. McKinnie had been rehabilitated. The trial court found that the State had established a racially neutral reason for its challenge and overruled the objection.

### Willie Heard

The State next challenged Ms. Heard, stating that she had indicated on her questionnaire that she had personal, moral, or religious beliefs against the death penalty, and that she did not like it but could not stop it. Defense counsel responded,

> this is their seventh black juror and it's their sixth woman that they have struck. She, like the others, went through and said she could listen to all three sentencing phases just like the others but we feel at this point in time you've got seven black jurors that have been stricken from the record.

The trial court then stated, "The Court finds that there is a racially neutral reason for the challenge but you might be careful about rehabilitating. The Court will look at it a little closer next time."

## Helen Pruitt

On defense counsel's <u>Batson</u> objection to the State's challenge of Ms. Pruitt, the prosecutor stated,

> This is the one I challenged because when I was questioning her, Judge, her eyes, she looked like she was going to cry to the point that I backed off asking her questions because she was sitting on the far side over there and I really felt that she was about to break out in tears and I backed off and I noticed when she was going into the jury box she got teary-eyed again and was shaking her head no. That's the reason.

Defense counsel replied, "Your Honor, we just want for the record that's the eighth African-American person and it's the seventh African-American woman stricken." The prosecutor retorted that they "still have four[7] on there," and the trial court ruled that the State's reason for challenging Ms. Pruitt was "not racially motivated."

The State lodged no further peremptory challenges. The Report of Trial Judge in Capital Cases, filed by the trial court pursuant to Tennessee Supreme Court Rule 12.1 ("the Rule 12 Report"), indicates that seven of the twelve jurors that decided Defendant's case were white.

As noted previously, this Court has instructed trial courts that, when making a determination regarding a <u>Batson</u> objection, they "must carefully articulate specific reasons for each finding on the record, i.e., whether a prima facie case has been established; whether a neutral explanation has been given; and whether the totality of the circumstances support a finding of purposeful discrimination." <u>Woodson</u>, 916 S.W.2d at 906. Thus, we are initially constrained to point out that the trial court's findings on Defendant's <u>Batson</u> objections at trial are barely adequate to permit our review. After each of defense counsel's objections, the trial court failed to make a specific finding that a prima facie case of purposeful discrimination had been made. Nevertheless, the prosecutor's response to each objection clearly implies that the trial court expected the State to proffer its reasons for challenging the subject venire person. That is, after each <u>Batson</u> objection by defense counsel, the trial court indicated in some fashion that the second prong of the <u>Batson</u> analysis was called into play. Thus, we assume that the trial court determined that, as to each of these five venire persons, Defendant had made out a prima facie case of impermissible discrimination. See <u>Woodson</u>, 916 S.W.2d at 905 (even where trial court made no explicit finding that the objecting party had made out a prima facie case, it was appropriate to conclude that the trial court had done so because "[o]therwise, the court would not have required [the striker] to explain the challenge"). Nor did the

---

[7]The record does not indicate whether the prosecutor was referring to four women, four African-American persons, or four African-American women.

trial court offer much commentary on the State's proffered reasons for its strikes, or render detailed findings about its reasons for overruling each of Defendant's Batson claims. We are especially concerned about the trial court's failure to make specific findings in light of the United States Supreme Court's recent decision in Miller-El II. Although decided after the trial of this case, Miller-El II demonstrates the importance of a complete record and comprehensive findings by the trial court.

In Miller-El II, the United States Supreme Court expounded on the methodology used to assess a Batson claim. In that case, the defendant was tried and convicted on a capital murder charge and sentenced to death. 125 S. Ct. at 2322. During jury selection, the prosecution used peremptory strikes against ten qualified African-American venire men. Id. The defendant argued, and the Court agreed, that the prosecution's challenges were racially motivated. Id. at 2340. In analyzing the defendant's claim, the Court engaged in an exhaustive and fact-intensive inquiry, relying upon not only the transcript of the voir dire, but the completed juror questionnaires and the juror cards utilized by the prosecution.[8]

As it examined the extensive evidence before it, the Court noted numerous factors indicative of the prosecution's impermissible motive in challenging the black venire members. Initially, the Court pointed to the fact that the prosecution had peremptorily struck ten of the eleven, or 91%, of the eligible African-American venire members. Id. at 2325. What it found "[m]ore powerful than these bare statistics," however, were the results of "side-by-side comparisons of some black venire panelists who were struck and white panelists allowed to serve." Id. In making these comparisons, the Court determined that, "[i]f a prosecutor's proffered reason for striking a black panelist applies just as well to an otherwise-similar nonblack who is permitted to serve, that is evidence tending to prove purposeful discrimination to be considered at Batson's third step." Id. Thus, "disparate treatment" of potential jurors who responded similarly to similar questions may be indicative of impermissible discrimination where the only significant difference between the persons is their race.

Another factor indicative of the prosecution's improper motive was its "disparate questioning" of the venire members, depending upon the member's race. The Court found that, for 94% of the white members, the prosecutors gave a "bland description" of the death penalty before asking for individual feelings on the subject. Id. at 2334. Only 47% of the African-American venire members heard the "bland" description, with the remaining 53% hearing what the Court described as a "graphic script." Id. The Court appeared to agree with the defendant that the prosecution used this tactic in an attempt to "prompt some expression of hesitation to consider the death penalty and thus to elicit plausibly neutral grounds for a peremptory strike of a potential juror subjected to it, if not a strike for cause." Id. at 2333. A second form of disparate questioning involved what the Court

---

[8]The record in this case does not contain the juror questionnaires or the juror cards used by either party. The record does contain a transcript of the voir dire and the written peremptory challenges filed by each party. The record also contains the Rule 12 Report which contains some information about the jury.

described as "trickery."  Id. at 2337.  The Court elucidated:

> The prosecutors asked members of the panel how low a sentence they would consider imposing for murder.  Most potential jurors were first told that Texas law provided for a minimum term of five years, but some members of the panel were not, and if a panel member then insisted on a minimum above five years, the prosecutor would suppress his normal preference for tough jurors and claim cause to strike.

Id.  The State conceded that the manipulative questioning was used to create cause to strike, but claimed that the five-year information was omitted not on the basis of race, but on stated opposition to or ambivalence about the death penalty.  Id.  The Court found, however, that, while all African-American panel members who had expressed opposition to or ambivalence about the death penalty were asked the trick question, "most white panel members who expressed similar opposition or ambivalence were not subjected to it."  Id.  The Court then stated, "[o]nce again, the implication of race in the prosecutors' choice of questioning cannot be explained away."  Id. at 2338.

In addition to examining the questions asked and treatment of venire members, the Supreme Court relied upon history:  "We know that for decades leading up to the time this case was tried prosecutors in the Dallas County office had followed a specific policy of systematically excluding blacks from juries . . . ."  Id.  In the Miller-El II case, the prosecutors had marked the race of each venire member on their juror cards and "took their cues [on jury selection] from a 20-year old manual of tips" which included reasons for excluding minorities from jury service.[9]  Id. at 2339-40.

The Court concluded:

> It blinks reality to deny that the State struck Fields and Warren  . . . because they were black.  The strikes correlate with no fact as well as they correlate with race, and they occurred during a selection infected by shuffling and disparate questioning that race explains better than any race-neutral reason advanced by the State.  The State's pretextual positions confirm [the defendant's] claim, and the prosecutors' own notes proclaim that the Sparling Manual's emphasis on race was on their minds when they considered every potential juror.

---

[9] In finding racially motivated discrimination by the prosecution, the Court also took into account "a procedure known in Texas as the jury shuffle."  Miller-El II, 125 S. Ct. at 2332.  This procedure permits either side to "literally reshuffle the cards bearing panel members' names, thus rearranging the order in which members of a venire panel are seated and reached for questioning."  Id.  Panel members seated in the back are less likely to be questioned, and those not questioned by the end of the week are dismissed.  Id. at 2333.  Thus, a party engaging in racially discriminatory jury selection may shuffle the jury in an attempt to have, for instance, African-American members reseated in the back.  Id.  In Miller-El II, the prosecution had shuffled the jury several times.  The Court found that "no racially neutral reason has ever been offered in this case [for the shuffling], and nothing stops the suspicion of discriminatory intent from rising to an inference."  Id.  Jury shuffling is not available in Tennessee.

-12-

The state court's conclusion that the prosecutors' strikes of Fields and Warren were not racially determined is shown up as wrong to a clear and convincing degree; the state court's conclusion was unreasonable as well as erroneous.

Id. at 2340. The Court thereupon granted the defendant's claim for habeas corpus relief. Id.

In contrast to Miller-El II, the sole indication of purposeful impermissible discrimination by the State in this case is the fact that each of the peremptory challenges used by the State was employed against an African-American venire person.[10] A close examination of the record convinces us, however, that the prosecution's exercise of these challenges was for race-neutral reasons.

With respect to the State's proffered reasons for its challenges, the prosecutor maintained that, with respect to Ms. Ferguson, Mr. Woods, Ms. McKinnie, and Ms. Heard, he was challenging each of these venire persons based upon his or her convictions about the death penalty. According to the State, each of these persons had indicated some personal or religious disinclination to sentence an individual to death. This is certainly a facially race-neutral reason for exercising a peremptory challenge against a potential juror in a capital case. As to Ms. Pruitt, the prosecutor stated that he excused her because, while he was questioning her, she looked as though she was going to cry. She later became "teary-eyed" again and "was shaking her head no." We are satisfied that the prosecutor also provided a facially race-neutral reason for his challenge to this juror.

The trial court ultimately determined that, under all the circumstances, Defendant failed to establish purposeful discrimination. "Because the core issue is the prosecutor's discriminatory intent, or lack thereof, the trial court's finding 'largely will turn on evaluation of credibility.'" State v. Ellison, 841 S.W.2d 824, 827 (Tenn. 1992) (quoting Batson, 476 U.S. at 98 n.21). Both this Court and the United States Supreme Court have previously recognized that "'[t]here will seldom be much evidence bearing on th[e] issue [of discriminatory intent], and the best evidence often will be the demeanor of the attorney who exercises the challenge.'" Id. (quoting Hernandez v. New York, 500 U.S. 352, 365 (1991) (plurality opinion)). Obviously, we are in no position to second-guess the trial court's assessment of the prosecutor's demeanor unless the record, as it did in Miller-El II, contains clear objective indications that the prosecutor's averments concerning his or her reasons for challenging a juror are simply not credible. We remain cognizant of Batson's holding that the ultimate burden of establishing purposeful discrimination lies with the party objecting to the peremptory challenge. 476 U.S. at 93; see also Purkett, 514 U.S. at 768 (recognizing that "the ultimate burden of persuasion regarding racial motivation rests with, and never shifts from, the opponent of the strike"). We must, examine, therefore, whether the record before us contains such strong evidence of impermissible discriminatory intent by the prosecution as to render clearly

---

[10]During the first round of peremptory challenges, the State challenged Mr. Hudson, Ms. Gibbs, and Ms. Pirtle. The State lodged a Batson objection to a peremptory challenge exercised by Defendant against, as described by the prosecutor, "a Caucasian . . . male." In response, defense counsel asserted that, during its initial peremptory challenges, the State excused "three black people." Neither the trial court nor the prosecutor commented on this description of Mr. Hudson, Ms. Gibbs, and Ms. Pirtle. We conclude, therefore, that each of these persons is African-American.

erroneous the trial court's determination that Defendant failed to establish purposeful discrimination by the prosecution in its peremptory challenges.

Taking our cue from Miller-El II, we first examine the "bare statistics" in this case regarding jury selection. The State exercised eight of its available fifteen peremptory challenges.[11] All of them were against African-American persons. We do not know, however, how many eligible African-American venire members were available. Defense counsel exercised sixteen peremptory challenges, one of which was against an alternate. See Tenn. R. Crim. P. 24(e). The record indicates that the State lodged Batson objections to two of these challenges, one of them on the basis that the juror was white. The record indicates that at least one of the other venire persons excused by the defense was white, but we are unable to ascertain the race of the remaining fourteen venire persons peremptorily challenged by Defendant. The United States 2000 Census provides that 41% of the population of the county in which Defendant was tried is black or African-American. It is reasonable to infer, therefore, that a significant proportion of the venire panel was African-American. The Rule 12 Report further indicates that five of the eventual twelve jurors in this case were non-Caucasian. The State had seven peremptory challenges remaining to it at the time the jury, including these five nonwhites, was sworn. These bare statistics do not, in and of themselves, convince us that the State's proffered race-neutral reasons for excusing the five named persons were merely pretextual.

A close review of the transcript of the voir dire reveals no disparate treatment based on race. All but one of the eight persons peremptorily challenged by the State had expressed some hesitation about the death penalty.[12] No other person expressed such hesitation and was left unchallenged. That is, the State was completely successful in eliminating every potential juror who had indicated at some point in the process that he or she had reservations about imposing the death penalty. There is no indication in the record that any nonblack person who expressed hesitation about the death penalty was left unchallenged by the State.

There is furthermore no indication in the record that the prosecution tailored its questions regarding the death penalty depending on the race of the targeted venire person(s). Nor does this Court observe any manipulative questioning by the State during voir dire which we would describe as "trickery." Finally, there is nothing before us to indicate that the prosecutors in Hardeman County have ever followed a specific policy of systematically excluding African-Americans from juries.

Certainly, more thorough findings by the trial court upon Defendant's Batson objections would have been helpful in our review of this issue. However, our close and careful review of the record before us convinces us that there is no basis for us to determine that the trial court erred

---

[11]Tennessee Rule of Criminal Procedure 24(d) provides that, where the charged offense is punishable by death, the defendant and the State are each entitled to fifteen peremptory challenges.

[12]Although we have determined that Defendant waived his right to appeal the State's exercise of peremptory challenges to Mr. Hudson, Ms. Gibbs, and Ms. Pirtle, a review of the circumstances surrounding their dismissals is appropriate to the comprehensive analysis set forth in Miller-El II. Each of these three persons expressed some reservation about imposing the death penalty during voir dire.

during the third step of the Batson analysis. This Court has previously recognized that a juror's reservations about the death penalty may constitute a legitimate explanation for the State's exercise of a peremptory strike. See Smith, 893 S.W.2d at 914. As to the State's dismissal of Ms. Pruitt, we acknowledge that "neutral explanations that are based on subjective assessments, such as the juror's demeanor, must be carefully scrutinized." State v. Carroll, 34 S.W.3d 317, 320 (Tenn. Crim. App. 2000). We note, however, that defense counsel did not in any way indicate during the jury selection process that the prosecution's description of Ms. Pruitt's conduct in the jury box was inaccurate. A potential juror who verges on tears and shakes her head "no" during voir dire would, we are sure, prompt many a trial lawyer to exercise a peremptory challenge for legitimate reasons. Thus, we are confident that the trial court accurately assessed the prosecutor's credibility with regard to his explanations and properly determined that, under all the circumstances, Defendant had not established purposeful discrimination by the State in its exercise of its peremptory challenges. Accordingly, we hold that Defendant is not entitled to relief on this issue.

## 2. Allegedly Gender-based Peremptory Challenges

We turn now to Defendant's claim that the prosecution peremptorily challenged Ms. Prewitt, Ms. Heard, Ms. McKinnie, and Ms. Ferguson because of their gender.[13] In J.E.B. v. Alabama ex rel. T.B., 511 U.S. 127, 129 (1994), the United States Supreme Court held that "gender, like race, is an unconstitutional proxy for juror competence and impartiality." We analyze a party's claim that a peremptory challenge is impermissibly gender-based in the same manner as a claim that a challenge is racially motivated. See id. at 144-45.

Initially, we note that Defendant first lodged a Batson objection to a peremptory challenge by the State upon the prosecution's removal of Ida Ferguson. By this time in the proceedings, the State had peremptorily challenged Linda Pirtle, Gertrude Gibbs, and Johnny Hudson. Thus, the State used three of its first four peremptory challenges to remove women from the jury. The record does not indicate the specific basis for Defendant's Batson claim as to Ms. Ferguson. Nor do the trial court's findings indicate a specific ruling as to what type of prima facie case Defendant apparently made out. Nevertheless, the trial court determined that the State's rejection of Ms. Ferguson was permissible. We see nothing in the record before us to indicate that the trial court's conclusion in this regard was clearly erroneous.

The State peremptorily challenged four more jurors, three of them female. Thus, of a total of eight peremptory challenges exercised by the prosecution, six were utilized against female venire persons, or 75%. However, as to each of the four women peremptorily challenged and to which Defendant lodged a Batson objection, the State proffered gender-neutral reasons for their removal. The trial court obviously determined that the State's proffered reasons were legitimate and not merely pretextual. The record before us does not convince us that the trial court thereby erred. The

---

[13]Because Defendant failed to object at trial to the State's peremptory challenges to Ms. Pirtle and Ms. Gibbs, we hold that Defendant has waived his equal protection claim as to the exclusion of these venire persons. See Tenn. R. App. P. 36(a); Johnson, 980 S.W.2d at 419.

-15-

jury that tried Defendant included six female jurors.[14]   The State had seven of its peremptory challenges remaining when the jury was empaneled.  All but one of the venire persons peremptorily challenged by the State and to which Defendant lodged a <u>Batson</u> objection had indicated some disinclination to impose the death penalty.  The other person, Ms. Pruitt, had exhibited a demeanor that caused the prosecutor to doubt her ability to sit on the jury in a composed manner.  In sum, we are satisfied that the trial court's findings on Defendant's gender-based <u>Batson</u> claims are not clearly erroneous.  Accordingly, Defendant is not entitled to relief on this issue.

## B.  Trial Court's Refusal to Dismiss Juror for Cause

Defendant also asserts in this appeal that the trial court erred in refusing to dismiss potential juror Barry Watkins for cause.  The State disagrees.

During the trial court's initial questioning of the venire, Mr. Barry Watkins responded that he knew something about the case.  When asked for the source of his information, Mr. Watkins replied that one of his brothers worked at the prison where the killing occurred.  Mr. Watkins stated, however, that the information he had obtained had not caused him to form an opinion about Defendant's guilt or innocence. Defense counsel subsequently requested a sequestered voir dire of Mr. Watkins, which the trial court granted.  During this additional voir dire, defense counsel asked Mr. Watkins if he was a convicted felon.  Mr. Watkins responded that he had been arrested but not convicted.  He explained that more than twenty years earlier, he had been arrested for a robbery. While he was being held, they arrested "the guy that did it." The charges against Mr. Watkins were then dismissed.  He was under the impression that his arrest was still "on record" because he was not allowed to buy guns.[15]

Mr. Watkins stated that Mr. Donald Watkins was his half-brother.  Mr. Watkins explained that he knew his half-brother might be called as a prosecution witness, but maintained that "that's all I knew."  His half-brother told him that he would need to advise the court of their relationship. When asked by the court if this relationship would affect his judgment, Mr. Watkins replied, "I can listen to the facts and what's been proven to me.  He is my brother but he can be mistaken like anybody else."  Mr. Watkins maintained that he would not give his relative's testimony any more weight or believability than that of the other witnesses.  Mr. Watkins told the trial court that his brother had not told him what his testimony would be about, or what he claimed the facts to be.  Mr. Watkins stated that he had not heard Defendant's name until "today."

---

[14]We base this conclusion on our review of the jurors' names listed in the trial court's order of conviction.

[15]Defendant avers in this appeal that "[b]ased on Barry Watkins's own testimony that he was not allowed to own a gun and that an Aggravated Robbery was cleared up several years earlier, one could surmise that this juror was in fact a convicted felon."  While we acknowledge that persons convicted of aggravated robbery are incompetent to serve as jurors, <u>see</u> Tenn. Code Ann. § 22-1-102(a)(2) (1994), this Court is not going to "surmise" that Mr. Watkins has been convicted of same absent any proof in the record.

-16-

Following this individual voir dire, defense counsel moved to strike Mr. Watkins for cause on the grounds that "it's too hard to overcome the bias of your brother testifying in the State's case in chief." The trial court denied defense counsel's request. Defendant now contends that the trial court's ruling resulted in a violation of his constitutional rights to a fair and impartial jury.

We are initially constrained to point out that Defendant did not raise this issue in his motion for new trial. Accordingly, this issue has been waived. See Tenn. R. App. P. 3(e) ("[I]n all cases tried by a jury, no issue presented for review shall be predicated upon error in the admission or exclusion of evidence, jury instructions granted or refused, misconduct of jurors, parties or counsel, or other action committed or occurring during the trial of the case, or other ground upon which a new trial is sought, unless the same was specifically stated in a motion for a new trial; otherwise such issues will be treated as waived."). Nevertheless, because this is a capital case, and because this issue involves Defendant's fundamental constitutional rights to a fair and impartial jury, we choose to address it on the merits.

Both the United States and Tennessee Constitutions guarantee criminal defendants the right to a trial by an "impartial jury." U.S. Const. amend. VI; Tenn. Const. art. I, § 9. "The impartial jury guaranteed by constitutional provisions is one which is of impartial frame of mind at the beginning of trial, is influenced only by legal and competent evidence produced during trial, and bases its verdict upon evidence connecting defendant with the commission of the crime charged." State v. Lawson, 794 S.W.2d 363, 367 (Tenn. Crim. App. 1990). To protect this right, litigants have the right to lodge a "propter affectum" challenge for cause to a potential juror on the basis that he or she is biased or prejudiced for or against one of the parties. See Toombs v. State, 270 S.W.2d 649, 650 (Tenn. 1954); State v. Akins, 867 S.W.2d 350, 355 (Tenn. Crim. App. 1993). A propter affectum challenge should be upheld where some bias or partiality is either actually shown to exist or is presumed to exist from circumstances. Durham v. State, 188 S.W.2d 555, 559 (Tenn. 1945). Circumstances justifying a presumption of bias include a juror's willful concealment of "ulterior and prejudicial motives" arising from his prior conviction and prior involvement as prosecuting witness in a case very similar to the defendant's, see id. at 559, and a juror's failure to disclose a "very close" familial relationship between the juror and the prosecuting attorney's wife, see Toombs, 270 S.W.2d at 651.

In this case, the trial court overruled defense counsel's challenge for cause to Mr. Watkins after both the prosecution and defense counsel had an opportunity to closely question him during a period of sequestered voir dire and after the trial court itself probed Mr. Watkins' impartiality. The trial court was obviously satisfied that Mr. Watkins' relationship would not prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath. A determination of the qualifications of a juror rests within the sound discretion of the trial court. State v. Howell, 868 S.W.2d 238, 248 (Tenn. 1993). We find no abuse of discretion in the trial court's refusal to excuse juror Watkins for cause in this case.

Defendant relies heavily on the Court of Criminal Appeals' opinion in State v. Pamplin, 138 S.W.3d 283 (Tenn. Crim. App. 2003). In that case, the defendant was on trial for assaulting a city

police officer and resisting arrest. One of the potential jurors was a county deputy sheriff who knew both the assaulted officer and the defendant. The deputy had previously served as a judicial commissioner for eight years and his sister-in-law worked for the district attorney. The deputy was a member of the same law enforcement agency as one of the prosecution's primary witnesses; indeed, the deputy was a subordinate employee of that witness. The deputy reported for jury duty in his uniform, including his badge and sidearm. The trial court denied the defendant's challenge to excuse the deputy from jury duty for cause. Because the defendant had exhausted all of his peremptory challenges, the deputy remained on the jury and was subsequently elected its foreman.

On appeal, the intermediate appellate court determined that the trial court had committed manifest error in refusing to excuse the deputy juror, finding that his "professional relationship and interest in the case was entirely too close to that of [the State's witness] and [the victim]." Id. at 286. The court noted not only the relationship between the deputy and the State's witnesses, but the nature of the case (involving an assault on a police officer) and the fact that the deputy served on the jury while in full uniform and wearing his sidearm. Id. The court emphasized that "the jury selection process should endeavor to select jurors who are not only fair and impartial but are also free from the suspicion of impartiality." Id. at 287.

We find the Pamplin case to be readily distinguishable from Defendant's. The combination of factors present in the Pamplin case created an egregious set of circumstances which are simply not present in the case before us. While we certainly agree that a close familial relationship between a juror and a witness may give rise to a suspicion of partiality, we are reluctant to conclude that a half-sibling connection is sufficient, in and of itself, to raise a presumption of bias so as to require a trial court to grant a propter affectum challenge. We recognize that many ties of kinship do not result in close relationships, and we are therefore unwilling to presume any particular level of bias arising from the familial relationship between Mr. Watkins and the State's witness. Rather, we agree with Maryland's high court on this point: "Although the relationship of a juror to one of the witnesses may present an opportunity for prejudice, bias will not be presumed and the defendant is not relieved of the burden of presenting facts in addition to mere relationship which would give rise to a showing of actual prejudice." Bristow v. State, 219 A.2d 33, 34 (Md. 1966); see also Bowman v. State, 598 S.W.2d 809, 812 (Tenn. Crim. App. 1980) (recognizing that, when the challenged juror disclosed her social relationship with one of the prosecuting attorneys, "[t]he burden is on the defendant to demonstrate that the juror was in some way biased or prejudiced" because the prosecuting attorney testified as a rebuttal witness).

In this case, Defendant has failed to present sufficient facts about juror Watkin's relationship with his half-brother to demonstrate either actual prejudice or that a presumption of prejudice is justified. Juror Watkins was forthcoming about his relationship with one of the State's witnesses. Moreover, he obviously convinced the trial court that he could judge the evidence in a non-biased manner and with no preconceived notion of Defendant's guilt. There is nothing in the record before us that convinces us that the trial court erred in reaching this conclusion.

Moreover, as this Court has previously held, "the failure to correctly exclude a juror for cause is grounds for reversal only if the defendant exhausts all of his peremptory challenges <u>and</u> an incompetent juror is forced upon him." <u>Howell</u>, 868 S.W.2d at 248 (emphasis added). In this case, Defendant did, indeed, exhaust all of his peremptory challenges, using one of them to excuse Mr. Watkins. However, we disagree with Defendant that an incompetent juror was thereby thrust upon him. Defendant argues that "[b]ased on the non-exclusion of . . . Barry Watkins for cause, [he] was forced to accept at least three (3) jurors that were incompetent, biased and/or not impartial" because they had prior knowledge of the allegations against Defendant from the media or personal relationships. Defendant particularly targets the jury foreperson, Mr. Burrough, who acknowledged some prior familiarity with the case from an acquaintance who worked at the Hardeman County Correctional Facility.

Mr. Burrough answered affirmatively the trial court's initial inquiry as to whether he had "heard or read anything at all about this case[.]" Mr. Burrough explained that his source of information was an acquaintance that worked at the prison. Mr. Burrough stated that the information he had heard had not caused him to form an opinion about Defendant's guilt or innocence and stated further that he would be able to base his verdict on the law and evidence charged by the trial court. Similarly, jurors Edna Blake and Eric Bolden indicated that they had each gained some information about the case from the media and/or "hearsay at work" prior to trial. Each assured the trial court that they had not formed an opinion about Defendant's guilt or innocence based on what they had heard.

Our rules of criminal procedure provide that a prospective juror may be challenged for cause where

> [t]he prospective juror's exposure to potentially prejudicial information makes the person unacceptable as a juror. Both the degree of exposure and the prospective juror's testimony as to his or her state of mind shall be considered in determining acceptability. A prospective juror who states that he or she will be unable to overcome preconceptions shall be subject to challenge for cause no matter how slight the exposure. If the prospective juror has seen or heard and remembers information that will be developed in the course of trial, or that may be inadmissible but is not so prejudicial as to create a substantial risk that his or her judgment will be affected, the prospective juror's acceptability shall depend on whether the testimony as to impartiality is believed. If the prospective juror admits to having formed an opinion, he or she shall be subject to challenge for cause unless the examination shows unequivocally that the prospective juror can be impartial.

Tenn. R. Crim. P. 24(b)(2). The record reveals that defense counsel made no attempt to challenge Mr. Burrough, Ms. Blake, or Mr. Bolden for cause. Apparently, defense counsel determined that none of these persons was so biased or prejudiced by the information they had heard prior to trial as to justify a for-cause challenge. Yet, Defendant now contends that he was forced to accept these

"incompetent, biased and/or not impartial" jurors because he exercised a peremptory challenge against Mr. Watkins.

Defendant fails to explain how these jurors' mild familiarity with the case prior to trial rendered them incompetent as jurors. Defendant has demonstrated neither partiality on the part of any of these jurors, nor any prejudice that he suffered as a result of any of these three persons sitting on the jury. "Juror bias must be shown, not just suspected." Lawson, 794 S.W.2d at 367 (citing Smith v. Phillips, 455 U.S. 209 (1982)). We are not persuaded that any of these three jurors was "incompetent" as required by Howell. Defendant has simply failed to demonstrate that he is entitled to a new trial on the basis of the trial court's refusal to dismiss Barry Watkins for cause. Accordingly, Defendant is not entitled to relief on this issue.

## II. Mandatory Review

When a defendant has been sentenced to death, we must conduct a mandatory review of the sentencing process pursuant to Tennessee Code Annotated section 39-13-206(c)(1) (2003). That provision of our criminal code requires us to determine whether a) the death sentence was imposed in any arbitrary fashion; b) the evidence supports the jury's finding of statutory aggravating circumstances; c) the evidence supports the jury's finding that the aggravating circumstances outweigh any mitigating circumstances; and d) the sentence of death is excessive or disproportionate to the penalty imposed in similar cases, considering both the nature of the crime and the defendant. Id.

### A. Imposition of Death Penalty

Initially, we find that the sentencing phase of Defendant's trial was conducted pursuant to the procedure established in the applicable statutory provisions and rules of criminal procedure. Accordingly, we conclude that the death penalty was not imposed in an arbitrary fashion.

### B. Sufficiency of Aggravating Circumstances

We turn now to the sufficiency of the evidence supporting the jury's finding of statutory aggravating circumstances. In this case, the jury determined that the State had proven beyond a reasonable doubt four aggravating circumstances: (a) Defendant was previously convicted of one or more felonies, other than the present charge, whose statutory elements involve the use of violence to the person; (b) Defendant's murder of the victim was especially heinous, atrocious, or cruel in that it involved torture or serious physical abuse beyond that necessary to produce death; (c) Defendant committed the murder while he was in lawful custody or in a place of lawful confinement; and (d) the murder was committed against a corrections employee who was engaged in the performance of official duties. See Tenn. Code Ann. § 39-13-204(i)(2), (5), (8), (9) (Supp. 1999). We must now review the evidence supporting each of these aggravating circumstances in the light most favorable to the State and determine whether a rational trier of fact could have found the existence of each beyond a reasonable doubt. State v. Bane, 57 S.W.3d 411, 426 (Tenn. 2001).

-20-

### 1. Prior Convictions

During the sentencing phase of Defendant's trial, the State introduced by stipulation three certified judgments against Defendant. These documents indicate that judgments of conviction were entered against Defendant in 1986 for first degree murder; in 1992 for first degree murder; and in 1998 for criminal attempt to commit first degree murder. Obviously, the statutory elements of the felony of first degree murder involve the use of violence to the person. See Tenn. Code Ann. § 39-13-202(a). This Court has further held that the statutory elements of attempted murder involve the use of violence to the person. State v. Cribbs, 967 S.W.2d 773, 782-83 (Tenn. 1998). Accordingly, we hold that the evidence is sufficient to support the jury's finding of the existence of this aggravating circumstance. See Tenn. Code Ann. § 39-13-204(i)(2) (Supp. 1999).

### 2. Especially Heinous, Atrocious, or Cruel

The jury determined that Defendant's murder of Steed was especially heinous, atrocious, or cruel in that it involved torture or serious physical abuse beyond that necessary to produce death. See id. at (i)(5). This aggravating circumstance may be applied if the evidence is sufficient to support either torture or serious physical abuse beyond that necessary to produce death. State v. Suttles, 30 S.W.3d 252, 262 (Tenn. 2000).

This Court has defined "serious physical abuse beyond that necessary to produce death" as follows:

> The word "serious" alludes to a matter of degree. The abuse must be physical, as opposed to mental, and it must be "beyond that" or more than what is "necessary to produce death." "Abuse" is defined as an act that is "excessive" or which makes "improper use of a thing," or which uses a thing "in a manner contrary to the natural or legal rules for its use."

State v. Odom, 928 S.W.2d 18, 26 (Tenn. 1996) (quoting Black's Law Dictionary 11 (6th ed. 1990)). The proof in this case established that Defendant stabbed Steed a total of thirty-six times. Twelve of the wounds were fatal. Dr. Smith testified that Defendant's infliction of so many wounds to the victim qualified for application of the term "overkill." He explained: "there was excessive injury done to the body far in excess of what would be necessary to cause death." The proof is more than sufficient to support the jury's finding of this aggravating circumstance.

### 3. Defendant in Lawful Custody

The proof at trial that Defendant was in lawful custody or in a place of lawful confinement at the time he killed Steed is clear and uncontroverted. The evidence is therefore sufficient to support the jury's finding of this aggravating circumstance. See Tenn. Code Ann. § 39-13-204(i)(8) (Supp. 1999).

## 4. Corrections Employee Victim

The record in this case contains a copy of the jury's verdict form which includes the written jury instructions provided to the jury by the trial court. These instructions informed the jury that it could apply as an aggravating circumstance that "[t]he murder was committed against any law enforcement officer, corrections official, corrections employee, engaged in the performance of official duties." The verdict form returned by the jury contains a handwritten finding by the jury that it applied as an aggravating circumstance that "the murder was committed against any law enforcement officer, corrections official, corrections employee, engaged in the performance of official duties."

The written instruction provided to the jury on this aggravating circumstance was erroneous. Our criminal code provides that the fact-finder may consider as an aggravating circumstance that

> [t]he murder was committed against any law enforcement officer, corrections official, corrections employee, emergency medical or rescue worker, emergency medical technician, paramedic or firefighter, who was engaged in the performance of official duties, <u>and the defendant knew or reasonably should have known that such victim was a law enforcement officer, corrections official, corrections employee, emergency medical or rescue worker, emergency medical technician, paramedic or firefighter engaged in the performance of official duties</u>.

Id. at (i)(9) (emphasis added). The trial court's written instruction to the jury in this case omitted the element requiring that Defendant knew or reasonably should have known that the victim was a law enforcement officer, corrections official, or corrections employee engaged in the performance of official duties.

Defendant did not raise this issue at trial, in his motion for new trial, or on appeal. Nevertheless, this Court will review a patently incomplete instruction at a capital sentencing hearing under the "plain error" doctrine, regardless of a defendant's failure to raise the issue. See State v. Stephenson, 878 S.W.2d 530, 554 (Tenn. 1994); see also State v. Hines, 758 S.W.2d 515, 523 (Tenn. 1988) (characterizing as "plain error" the trial court's incomplete instructions on two of three aggravating circumstances found by the jury). This Court will grant relief under the plain error doctrine only "where necessary to do substantial justice." Tenn. R. Crim. P. 52(b). As we have stated previously, "the error must be of such a great magnitude that it probably changed the outcome of the trial." State v. Faulkner, 154 S.W.3d 48, 58 (Tenn. 2005). An appellate court will reverse for plain error only if:

(a) the record . . . clearly establish[es] what occurred in the trial court;
(b) a clear and unequivocal rule of law [has] been breached;
(c) a substantial right of the accused [has] been adversely affected;
(d) the accused did not waive the issue for tactical reasons; and
(e) consideration of the error is "necessary to do substantial justice."

State v. Smith, 24 S.W.3d 274, 282 (Tenn. 2000) (quoting State v. Adkisson, 899 S.W.2d 626, 641-42 (Tenn. Crim. App. 1994)). All five factors must be established and an appellate court need not consider all five factors if any one factor indicates that relief is not warranted. Id. at 283.

In this case, the proof at trial was uncontroverted that Defendant knew the victim was a corrections employee: indeed, Defendant committed the murder because of the victim's performance in that role. The proof at trial was further uncontroverted that Defendant knew the victim was engaged in the performance of his official duties when Defendant brutally stabbed him to death. Defendant told Mr. Dunaway that he approached the victim during a counseling session only to be ignored. At that point, Defendant determined to kill the victim.

The trial court's error in its written instruction to the jury on this aggravating circumstance is analogous to that committed when a trial court omits from its instructions an essential element of an offense. In State v. Garrison, 40 S.W.3d 426, 433 (Tenn. 2000), the trial court omitted from its charge one of the mens rea elements of the indicted offense. This Court found the erroneous instruction harmless beyond a reasonable doubt because proof of the omitted element was not contested at trial and was essentially conceded by the defendant. Id. at 435; see also Neder v. United States, 527 U.S. 1, 18-20 (1999) (finding trial court's failure to instruct on an element of offense harmless beyond a reasonable doubt where omitted element was supported by uncontroverted evidence). The same result obtains here for the same reason: Defendant admitted his knowledge of the victim's employment and that the victim was engaged in official duties at the time Defendant killed him. Thus, the instructional error did not adversely affect a substantial right of the accused.

Finally, given the nature of the proof in this case, we are convinced beyond a reasonable doubt that the jury would have found and applied this aggravating circumstance had it received the correct instruction. Therefore, Defendant suffered no prejudice as a result of the trial court's error and we need not reverse his sentence of death in order to "do substantial justice." Defendant is entitled to no relief on the basis of the trial court's instructional error on this aggravating circumstance.

## C. Aggravating Circumstances Outweigh Mitigating Circumstances

After the close of the State's proof during the sentencing phase of Defendant's trial, and while the jury was out, the trial court questioned Defendant about his decision regarding the presentation of proof of mitigating circumstances. Defendant stated that he did not want his lawyers to present any proof of mitigating circumstances. Furthermore, Defendant chose not to testify on his own behalf during the sentencing phase. Accordingly, the defense presented no proof during the sentencing phase of Defendant's trial of any mitigating circumstances that might counteract the State's proof of aggravating circumstances. The only proof in the nature of mitigating circumstances presented during the guilt phase of Defendant's trial was Defendant's testimony about how the victim had treated him.

We conclude that the State's proof of aggravating circumstances outweighs any mitigating circumstances beyond a reasonable doubt.

## D. Proportionality

We turn now to our analysis of whether the sentence imposed in this case is excessive or disproportionate to the penalty imposed in similar cases. This review identifies aberrant, arbitrary, or capricious sentencing by determining whether the death sentence is "'disproportionate to the punishment imposed on others convicted of the same crime.'" State v. Bland, 958 S.W.2d 651, 662 (Tenn. 1997) (quoting Pulley v. Harris, 465 U.S. 37, 42-43 (1984)). We begin with the presumption that a death sentence is proportional with the crime of first degree murder. State v. Hall, 976 S.W.2d 121, 135 (Tenn. 1998).

In conducting this review, we employ the precedent-seeking method of comparative proportionality review, in which we compare this case with other cases involving similar defendants and similar crimes. See Bland, 958 S.W.2d at 665-67. While no defendants or crimes are identical, a death sentence is disproportionate if a case is "plainly lacking in circumstances consistent with those in cases where the death penalty has been imposed." Id. at 668. Our inquiry, however, does not require a finding that "a sentence less than death was never imposed in a case with similar characteristics." Id. at 665. This Court has repeatedly held that the pool of cases considered by this Court in its proportionality review includes "those first degree murder cases in which the State seeks the death penalty, a capital sentencing hearing is held, and the sentencing jury determines whether the sentence should be life imprisonment, life imprisonment without the possibility of parole, or death." State v. Reid, 164 S.W.3d 286, 316 (Tenn. 2005).

In reviewing the applicable pool of cases, we consider numerous factors regarding the offense: 1) the means of death; (2) the manner of death; (3) the motivation for the killing; (4) the place of death; (5) the victim's age, physical condition, and psychological condition; (6) the absence or presence of premeditation; (7) the absence or presence of provocation; (8) the absence or presence of justification; and (9) the injury to and effect upon non-decedent victims. Bland, 958 S.W.2d at 667. In addition, we consider numerous factors about the defendant: (1) prior criminal record or activity; (2) age, race, and gender; (3) mental, emotional, and physical condition; (4) role in the murder; (5) cooperation with authorities; (6) level of remorse; (7) knowledge of the victim's helplessness; and (8) potential for rehabilitation. Id.; see also Bane, 57 S.W.3d at 428-29 .

In this case, the incarcerated Defendant armed himself with a weapon he had created specifically to use against another human being, walked up behind the seated and unarmed victim, a corrections counselor, and began repeatedly stabbing him, aiming initially for the victim's vital organs. Defendant stabbed the victim thirty-six times; twelve of the wounds were lethal. Defendant committed the killing intentionally and with premeditation. Defendant killed the victim because he felt the victim had "disrespected" him. The victim was fifty-seven years old. Defendant killed Mr. Steed while he was engaged in his official duties. Defendant has expressed no remorse for the killing; indeed, Defendant has made clear that he would commit the killing again if given the

opportunity. Prior to the instant murder, Defendant had killed two other persons and attempted to kill a third person. Defendant has demonstrated no potential for rehabilitation.

In State v. Taylor, 771 S.W.2d 387, 401(Tenn. 1989), this Court affirmed a sentence of death after the defendant was convicted of the first degree murder of a prison guard. In Taylor, the defendant was incarcerated at the Turney Center. The defendant believed he had been treated unfairly by Corrections Officer Moore on several occasions. On the day of the killing, Officer Moore reprimanded the defendant for failing to properly clean an area, and this incident angered the defendant. Later that day, the defendant approached Officer Moore from behind as the officer was talking to some inmates, grabbed him, and began stabbing him repeatedly with a prison-made knife. Despite pleas from other inmates to cease his attack, the defendant continued to stab the officer, brandishing his weapon at those who tried to come to Moore's aid. The jury sentenced the defendant to death on the basis of four aggravating circumstances: (1) the defendant had previously been convicted of a felony that involved the use or threat of violence to the person; (2) the murder was especially heinous, atrocious, or cruel in that it involved torture or depravity of mind; (3) the murder was committed by the defendant while he was in lawful custody or in a place of lawful confinement; and (4) the murder was committed against a corrections employee, who was engaged in the performance of his duties, and the defendant knew that the victim was a corrections employee engaged in the performance of his duties. Id. at 392. This Court upheld the death sentence. Id. at 401.

In State v. Henderson, 24 S.W.3d 307, 310 (Tenn. 2000), the defendant murdered a deputy by shooting him in the back of the head during an escape attempt. While incarcerated, the defendant had his girlfriend smuggle to him a handgun. The defendant then arranged for a visit to a dentist. While awaiting treatment, the defendant pulled the handgun, threatening the dentist and his assistant. The dentist called for help, and the deputy, who had been in the reception area, responded. The defendant fired at the deputy, grazing him with a gunshot. The deputy fell and struck his head, rendering him unconscious. The defendant left the treatment room, but then returned and fired a shot into the back of the unmoving deputy's head at point blank range, killing him. The defendant then escaped, only to be apprehended a short time later. The defendant pled guilty to first degree premeditated murder and waived a jury as to his sentencing. Id. at 311. The trial court subsequently imposed the death sentence on the basis of four aggravating circumstances: (1) that the defendant knowingly created a great risk of death to two or more persons, other than the victim murdered, during the act of murder; (2) that the defendant committed the murder for the purpose of avoiding, interfering with, or preventing a lawful arrest or prosecution of the defendant or another; (3) that the defendant committed the murder while in lawful custody or in a place of lawful confinement or during the defendant's escape from same; and (4) the murder was committed against any law enforcement officer who was engaged in the performance of official duties. Id. at 312. This Court affirmed the defendant's sentence of death. Id. at 319.

In State v. Sutton, 761 S.W.2d 763, 764 (Tenn. 1988), the defendant was convicted of the first degree murder of a fellow inmate. The State's proof indicated that the defendant had stabbed the victim multiple times with a prison-made knife after the victim had sold him unsatisfactory

marijuana. The jury found and applied three aggravating circumstances: (1) the defendant was previously convicted of one or more felonies involving the use or threat of violence to the person; (2) the murder was especially heinous, atrocious, or cruel in that it involved torture or depravity of mind; and (3) the defendant committed the murder while he was in a place of lawful confinement. Id. This Court affirmed the death sentence. Id.

This Court has upheld the death penalty in numerous cases where the sole aggravating circumstance was the defendant's prior conviction of a violent felony offense. See, e.g., State v. McKinney, 74 S.W.3d 291 (Tenn. 2002) (upholding death sentence of defendant convicted of premeditated murder for shooting and killing an off-duty police officer at night club where sole aggravating circumstance was based on defendant's prior conviction of aggravated robbery); State v. Chalmers, 28 S.W.3d 913 (Tenn. 2000) (upholding death sentence of defendant convicted of felony murder for shooting and killing victim during robbery where sole aggravating circumstance was based on defendant's prior convictions of attempted especially aggravated robbery and attempted first degree murder); State v. Keough, 18 S.W.3d 175 (Tenn. 2000) (upholding death sentence of defendant convicted of premeditated murder for stabbing and killing estranged wife during argument where aggravating circumstance was based on defendant's prior convictions for assault to commit voluntary manslaughter and manslaughter); State v. Smith, 993 S.W.2d 6 (Tenn. 1999) (upholding death sentence of defendant convicted of felony murder for shooting and killing victim during robbery where aggravating circumstance was based on defendant's prior convictions of robbery and first degree murder); State v. Adkins, 725 S.W.2d 660 (Tenn. 1987) (upholding death sentence of defendant convicted of first degree murder for shooting and killing estranged girlfriend's friend where aggravating circumstance was based on defendant's prior convictions of second degree murder and aggravated assault). As this Court has frequently stated, this aggravating circumstance is "more qualitatively persuasive and objectively reliable than other[]" aggravating circumstances. Howell, 868 S.W.2d at 261.

This Court has also upheld numerous death sentences where the defendant stabbed to death the victim and the jury applied the heinous, atrocious, or cruel aggravating circumstance. See, e.g., Reid, 164 S.W.3d at 296-97 (upholding two death sentences upon defendant's convictions for two premeditated murders where defendant stabbed victims to death in course of robbery, and jury applied as aggravating circumstances defendant's previous violent felonies, that the murders were especially heinous, atrocious, or cruel in that they involved torture or serious physical abuse beyond that necessary to produce death, and that the murders were committed to avoid prosecution); Suttles, 30 S.W.3d at 260 (upholding death sentence of defendant convicted of premeditated murder for multiple stabbing death of estranged girlfriend and jury found as aggravating circumstances that the murder was especially heinous, atrocious, or cruel in that it involved torture or serious physical abuse beyond that necessary to cause death and that defendant was previously convicted of violent felonies); State v. Bush, 942 S.W.2d 489 (Tenn. 1997) (upholding death sentence upon defendant's conviction of premeditated murder for stabbing victim forty-three times, killing her, and jury determined the murder to have been heinous, atrocious, or cruel and committed to avoid prosecution); State v. Hines, 919 S.W.2d 573 (Tenn. 1995) (upholding death sentence upon defendant's conviction of felony murder in perpetration of robbery where defendant stabbed victim

to death in such a manner as to justify heinous, atrocious, or cruel aggravator; jury also applied prior violent felony aggravator); State v. Payne, 791 S.W.2d 10 (Tenn. 1990) (upholding two death sentences upon defendant's convictions of two first degree murders where defendant stabbed mother and young daughter multiple times and jury applied heinous, atrocious, or cruel aggravating circumstance); State v. Jones, 789 S.W.2d 545 (Tenn. 1990) (upholding death sentence upon defendant's first degree murder conviction for stabbing victim multiple times during course of robbery and jury applied prior violent felonies; heinous, atrocious, or cruel; and felony murder aggravating circumstances); State v. Thompson, 768 S.W.2d 239 (Tenn. 1989) (upholding death sentence upon defendant's conviction of first degree murder for stabbing victim to death where jury applied heinous, atrocious, or cruel aggravating circumstance together with aggravators for committing the murder to avoid prosecution and committing the murder during a robbery or kidnapping); State v. West, 767 S.W.2d 387, 391 (Tenn. 1989) (upholding two death sentences where defendant involved in stabbing two victims to death, involving "torture wounds," and jury applied heinous, atrocious, or cruel; murder committed to avoid prosecution; and felony murder aggravating circumstances).

## CONCLUSION

In accordance with Tennessee Code Annotated section 39-13-206(c)(1) and the principles adopted in prior decisions, we have considered the entire record in this case and conclude that the sentence of death has not been imposed arbitrarily, that the evidence supports the jury's finding that the aggravating circumstances outweigh any mitigating circumstances beyond a reasonable doubt, and that the sentence is not excessive or disproportionate.

We have reviewed all of the issues raised by Defendant and conclude that they do not warrant relief. With respect to issues that were raised in this Court but not addressed in this opinion, we affirm the decision of the Court of Criminal Appeals. Relevant portions of that opinion are incorporated herein and are attached as an appendix. Defendant's conviction and sentence of death are affirmed. The sentence of death shall be carried out as provided by law on the 15th day of August, 2006, unless otherwise ordered by this Court or other proper authority. It appearing that Defendant Stephen Lynn Hugueley is indigent, costs of this appeal are taxed to the State of Tennessee.

_____
CORNELIA A. CLARK, JUSTICE