IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
Assigned on Briefs November 24, 2009 at Knoxville

**STATE OF TENNESSEE v. CRAIG O. MAJORS**

**Appeal from the Circuit Court for Montgomery County**
**No. 4071074     Michael R. Jones, Judge**

—————

**No. M2009-00483-CCA-R3-CD - Filed June 21, 2010**

—————

The Defendant, Craig O. Majors, was convicted by a Montgomery County jury of especially aggravated kidnapping, a Class A felony, attempted aggravated robbery, a Class C felony, and aggravated burglary, a Class C felony.  The trial court sentenced the Defendant to concurrent sentences of twenty years as a Range I offender for the especially aggravated kidnapping conviction and to six years each as a Range II offender for the attempted aggravated robbery and aggravated burglary convictions, for a total effective sentence of twenty years.  In this appeal as of right, the Defendant contends that (1) the State's exercise of peremptory challenges to excuse African-Americans from the jury pool resulted in a systematic exclusion of African-Americans from the jury, (2) his convictions for especially aggravated kidnapping and attempted aggravated robbery violate due process, (3) there is insufficient evidence of his identity as the perpetrator, and (4) the trial court imposed an excessive sentence.  Following our review, we affirm the judgments of the trial court.

**Tenn. R. App. P.  3 Appeal as of Right; Judgments of the Circuit Court
are Affirmed.**

D. KELLY THOMAS, JR., J., delivered the opinion of the court, in which JAMES CURWOOD WITT, JR., and NORMA MCGEE OGLE, JJ., joined.

Roger E. Nell, District Public Defender; and Sarah R. King (on appeal) and Rebecca Stevens (at trial), Assistant Public Defenders, attorneys for appellant, Craig O. Majors.

Robert E. Cooper, Jr., Attorney General and Reporter; J. Ross Dyer, Senior Counsel; John Wesley Carney, Jr., District Attorney General; and Steven L. Garrett, Assistant District Attorney General, attorneys for appellee, State of Tennessee.

## OPINION

The Defendant's convictions arise from the home invasion of Gene and Wendy Douglas in the early morning hours of June 27, 2007. Wendy Douglas testified that she was asleep when she heard her husband calling her for help and asking her to call 9-1-1. She found her husband in the garage struggling with an individual. The individual was on top of her husband and had his hands around her husband's throat. Mrs. Douglas testified that she ran to her husband's aid and struck the assailant in the head. She then ran back to her bathroom where she called 9-1-1 from her cellular telephone. Soon after she made the telephone call, the assailant fled the couple's garage. The couple discovered that the keyless entry to Mrs. Douglas' car was missing, along with her driver's license and a credit union debit card. Within minutes, the police brought a suspect to the couple's home where Mrs. Douglas and her husband separately identified the Defendant as the intruder. Mrs. Douglas described the events of that night as "terrifying" and "horrible."

Gene Douglas testified that he typically awakes at 1:00 a.m. to work in his home office before leaving for work at 4:30 a.m. each day. On June 27, he went to the kitchen for coffee before going down the hallway to his home office. As soon as he entered his office, he realized that "things were disheveled." Upon further inspection, he said that he found "someone standing there . . . pointing a gun at me" when he went down the hallway to a bathroom doorway. He described that he was "gripped with fear."

Mr. Douglas recalled that the Defendant told him not to do anything or he would kill him. The Defendant ordered Mr. Douglas to the kitchen where Mr. Douglas was able to discreetly put some kitchen shears in the pocket of his bathrobe. Mr. Douglas told the Defendant that his wife was asleep and that if the Defendant wanted money, they would need to go to an automated teller machine (ATM).

Mr. Douglas said that the Defendant then ordered him to the garage where the Defendant attempted to tie his hands behind his back. During this effort, Mr. Douglas realized that the Defendant's gun was no longer pointed at him so he jumped on the Defendant to disarm him. The gun dropped and fell into pieces on the garage floor. Next, a struggle ensued during which the Defendant began to strangle Mr. Douglas. At about this time, while Mr. Douglas was yelling for his wife's help, Mrs. Douglas ran into the garage and hit the Defendant on the head. At some point, Mr. Douglas reached for the kitchen shears that were hidden in his bathrobe.

Eventually, the Defendant fled the scene through the garage door. By then, Mrs. Douglas had contacted the police, and the couple directed the police to their home and, ultimately, the discovery of the Defendant. Mr. Douglas testified that he was still on the telephone with the 9-1-1 operator when the police arrived. Soon after, another officer

2

arrived with the Defendant and the couple separately identified the Defendant as their assailant.

Mr. Douglas recalled that the Defendant threatened to torture him and his wife and leave them dead in their home. The Defendant also told Mr. Douglas that someone was waiting for him. Mr. Douglas said that he initially believed the Defendant was pointing a rifle at him and did not realize the weapon was an air gun until it fell apart in the garage. Mr. Douglas also stated that his wallet was found empty in the office, although the credit cards taken from the wallet were never recovered.

Montgomery County 9-1-1 operator Suzan Gafford testified that she received a call on June 27, 2007 at approximately 2:00 a.m. from someone reporting an intruder in her home. Ms. Gafford later learned that the caller was Mrs. Douglas. Ms. Gafford recalled that the caller was so upset that she was unable to obtain much information from her at first but eventually the caller's husband came to the phone. The twenty minute 9-1-1 conversation, which recited the events of the night leading up to several officers' arrival at the Douglas home, was played for the jury.

Detective Julie Webb of the Montgomery County Sheriff's Office testified that she was called to the Douglas home to investigate the home invasion. On her way, she saw a "beat up old white pickup truck" stopped within one mile of the Douglas home. She recalled that Deputy Dexter Mines was with the truck. He was talking to two people and had another person in his cruiser. About twenty minutes after Detective Webb's arrival at the Douglas home, Deputy Mines arrived with the individual and the Douglases separately identified the individual, the Defendant, as their assailant. Detective Webb recalled that both Mr. and Mrs. Douglas "appeared to be certain" in their identification of the Defendant.

Montgomery County Sheriff's Office Corporal Stephen Heise testified that he, Deputy Mines and Deputy William Wall responded to the call of the home invasion. While blocking escape routes from the residence, Corporal Heise observed a white pick-up truck approaching his vehicle. Suddenly, a black male jumped out of the vehicle. Corporal Heise was able to apprehend the man while Deputy Mines questioned two others in the truck. Deputy Wall also located a wrecked and abandoned vehicle less than one quarter of a mile from the Douglas home.

Savannah Carroll testified that she and Billy Joe Biggs were at the Lock B Recreational Area early in the morning on June 27, 2007. She recalled that they had only been there about five minutes when they "heard a big boom, like a crash." They drove away from the recreational area and soon discovered a wrecked car. When she and Mr. Biggs stopped to see if anyone needed help, a young black man, the Defendant, walked out of the

3

woods and told them that he had been driving while drinking and had an accident. Ms. Carroll recalled that the Defendant wore distinctive braids in his hair. Ms. Carroll stated that another black man with a shaved head ran back into the woods. She said that he "didn't want to go with us." However, the Defendant accepted their offer of a ride to a nearby store. Before they reached the store, the police surrounded their pickup truck. When the Defendant attempted to run from the vehicle, the police apprehended him.

No weapons or stolen property were recovered from the Defendant. Shoe prints taken from outside an open window at the scene matched those worn by the Defendant, although they were a common style of athletic shoe. There were no identifiable fingerprints found at the scene. Despite a diligent search, the second suspect was never found. Deputy Mines recalled that a dark-colored new model pickup truck sped by them while they questioned the witnesses at the white truck.

Based upon this evidence, the jury convicted the Defendant of the especially aggravated kidnapping and attempted robbery of Gene Douglas and the aggravated burglary of the Douglas home.

ANALYSIS

*Jury Selection Issue*

The Defendant contends that the State utilized peremptory challenges to exclude African-American jurors from the jury. See Batson v. Kentucky, 476 U.S. 79 (1986). He cites to the State's striking of potential jurors Johnson and Williams, claiming that the State did not offer an adequate race-neutral basis for their exclusion. The State contends that no Batson error occurred because the prosecutor provided a race-neutral explanation each time an African-American member of the jury pool was excluded from the jury; therefore, the trial court properly determined that no purposeful discrimination occurred. Following our review, we agree with the State.

In Batson, the Supreme Court held that the State's exclusion of potential jurors solely based upon race violates the Equal Protection Clause of the Fourteenth Amendment. Batson, 476 U.S. at 89. There are three prerequisites that must be met in order to establish a Batson violation: (1) the Defendant must establish a prima facie case of purposeful discrimination, id. at 96; (2) the State must be given the opportunity to rebut the prima facie case by offering a race-neutral explanation for the exercise of the peremptory challenge, id. at 97; and (3) the trial court must then determine whether the Defendant has established purposeful discrimination. Id. at 98.

Although the State's race-neutral explanation must be reasonable and specific, id. at 98, there is no requirement that it be persuasive or plausible. Purkett v. Elem, 514 U.S. 765, 767-68 (1995); see also State v. Hugueley, 185 S.W.3d 356, 368 (Tenn. 2006). Essentially, "[u]nless a discriminatory intent is inherent in the prosecutor's explanation, the reason offered will be deemed race-neutral." Elem, 514 U.S. at 768; see also Hugueley, 185 S.W.3d at 368. However, the trial court must consider the explanation in light of all of the evidence to insure that the explanation is not pretextual. Miller-El v. Dretke, 545 U.S. 231, 251-52 (2005); Hugueley, 185 S.W.3d at 369.

In order to facilitate appellate review concerning a Batson issue, the trial court must carefully articulate its findings on the record. See State v. Smith, 893 S.W.2d 908, 914 (Tenn.1994) (citing State v. Ellison, 841 S.W.2d 824, 827 (Tenn. 1992)), cert. denied 516 U.S. 829 (1995)). Furthermore, the trial court is in the position to judge the credibility of both the potential jurors and counsel because the trial court has the opportunity to observe their demeanor. Smith, 893 S.W.2d at 914. Therefore, "[o]n appeal, a trial court's ruling on the issue of discriminatory intent must be sustained unless it is clearly erroneous." Snyder v. Louisiana, 552 U.S. 472, 477 (2008); see also Hugueley, 185 S.W.3d at 359.

The record reflects that the State exercised two of its peremptory challenges to excuse two potential jurors who were African-American. In each instance, the Defendant objected and asserted that the State was excluding the individuals on the basis of race. The Defendant offered as prima facie evidence of purposeful discrimination a general assertion that "this county has worked long and hard for people of color to even be able to participate in juries. It has only been within the past decade that they were even called. . . . I ask that peremptories [sic] not be allowed."

Without initially acknowledging whether the Defendant had established a prima facie case of purposeful discrimination, the trial court allowed the State the opportunity to provide a race-neutral explanation for the two challenges. Relative to potential juror Johnson, the prosecutor explained that she "failed to maintain eye contact with me as I posed questions . . . she did have eye contact with [defense counsel] . . .which indicates an affinity for the Defense Counsel . . . [which] would affect her ability to sit as a fair and impartial juror in this case." Relative to potential juror Williams, who during voir dire expressed some equivocation regarding his ability to "pass judgment" on another individual given his admitted dalliances with crime as a younger man, the prosecutor explained that "I think the record reflects equivocation as to an essential quality, and that is sitting in judgement of these individuals" and "the intimations are that he had been in trouble before." The prosecutor also noted that although the State had exercised two peremptory challenges against African-Americans, "there are three blacks that are in the panel now and they have not been challenged."

5

The trial court overruled each Batson challenge. Relative to potential juror Johnson, the court specifically found that there was no evidence of purposeful discrimination in the county or with specific respect to the challenge of Ms. Johnson. The trial court found that "[t]he determination by the State was not based upon race. The way the jurors are selected in this County is Constitutional. Whether it comes out on a certain panel to reach a percentage is another question. But the determination by the State is not based on race." Relative to potential juror Williams, the court noted Mr. Williams' admission concerning criminal activity when he was younger and stated that although "he had turned his life around, [it] might be a reason that the State might want to challenge, totally outside the race [issue]."

We conclude that the evidence supports the trial court's findings. The State explained its reasons for striking two African-American members from the jury panel, and from our consideration of the evidence, we conclude that there is no inherent discriminatory intent shown. Accordingly, the trial court's denial of the Batson challenges is affirmed.

*Due Process Issue*

Next, the Defendant contends that his convictions for especially aggravated kidnapping and attempted aggravated robbery violates due process because, he argues, the especially aggravated kidnapping was incidental to the attempted aggravated robbery. See State v. Anthony, 817 S.W.2d 299 (Tenn. 1991). The State argues that the dual convictions do not violate due process because the Defendant committed attempted aggravated robbery when he first demanded money from the victim and it was unnecessary to order him throughout the home, into the garage, and attempt to tie the victim in order to accomplish the attempted aggravated robbery. The State also argues that the further restraint of the victim made it less likely that the victim could summon help and increased the risk of harm to the victim.

In Anthony, our supreme court held that dual convictions for armed robbery and aggravated kidnapping violated the due process guarantees of article I, section 8 of the Tennessee Constitution when the confinement, movement, or detention of the kidnapping is "essentially incidental" to the robbery. Anthony, 817 S.W.2d at 306. Therefore, in order for dual convictions to stand, the trial court must determine whether the confinement, movement, or detention was significant enough, in and of itself, to warrant independent prosecution. Id. As guidance, our supreme court noted that "one method of resolving this question is to ask whether the defendant's conduct 'substantially increased [the] risk of harm over and above that necessarily present in the crime ... itself.'" Id. (quoting State v. Rollins, 605 S.W.2d 828, 830 (Tenn. Crim. App. 1980)). The court also admonished courts "to apply the [kidnapping] statute narrowly, so as to make its reach fundamentally fair and to protect the due process

6

rights of every citizen." Id.

Six years later, in State v. Dixon, 957 S.W.2d 532 (Tenn. 1997), the court refined Anthony's applicability to those cases to "prevent the injustice which would occur if a defendant could be convicted of kidnapping where the only restraint utilized was that necessary to complete the act of rape or robbery." Dixon, 957 S.W.2d at 534. Likewise, a separate conviction for kidnapping may stand for "any restraint in addition to that which is necessary to consummate rape or robbery." Id. at 535. The court went further to establish a two-prong test for analyzing when a separate conviction for kidnapping violates due process. First, the trial court must determine "whether the movement or confinement was beyond that necessary" to commit the accompanying felony. Id. If so, the trial court must then ascertain "whether the additional movement or confinement: (1) prevented the victim from summoning help; (2) lessened the defendant's risk of detection; or (3) created a significant danger or increased the victim's risk of harm." Id.

Applying these standards to the facts of this case, the record reflects that when the victim discovered the Defendant in his home, the Defendant immediately pointed his weapon at the victim and demanded money. Contemporaneous to this request was the threat to torture and leave for dead both Mr. Douglas and his wife. The Defendant then ordered the victim down the hallway, through the kitchen and into the garage where he attempted to restrain the victim with cords and rope. We agree with the State that this additional movement and confinement exceeded what was necessary to accomplish the attempted aggravated robbery.

Turning to the second prong of the Dixon analysis, the evidence shows that the victim was able to summon help from his wife although he had been moved to the garage by the Defendant. However, the evidence also shows that the Defendant ordered the victim to the garage in order to bind the victim. Furthermore, the movement to the garage presented the opportunity for the struggle between the Defendant and the victim. Therefore, we conclude that the additional movement and confinement both "lessened the [D]efendant's risk of detection" and "increased the victim's risk of harm." Accordingly, dual convictions for especially aggravated kidnapping and attempted aggravated robbery do not violate due process under these facts and circumstances.

*Sufficiency of the Evidence*

The Defendant contends that the evidence is insufficient to prove his identity as the perpetrator of the offenses because his fingerprints were not found at the scene, none of the missing items were found in his possession, and there were inconsistencies between the victims' description of him and his actual appearance. The State argues that the victims, after

sufficient observation of the Defendant at the scene, positively identified the Defendant within minutes of the offenses and that any controverting facts concerning fingerprints and stolen property were properly resolved by the jury in their verdict. Following our review, we agree with the State.

An appellate court's standard of review when the defendant questions the sufficiency of the evidence on appeal is "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319 (1979). The appellate court does not reweigh the evidence; rather, it presumes that the jury has resolved all conflicts in the testimony and drawn all reasonable inferences from the evidence in favor of the State. See State v. Sheffield, 676 S.W.2d 542, 547 (Tenn. 1984); State v. Cabbage, 571 S.W.2d 832, 835 (Tenn. 1978). Questions regarding witness credibility, conflicts in testimony, and the weight and value to be given to evidence were resolved by the jury. See State v. Bland, 958 S.W.2d 651, 659 (Tenn. 1997). "A verdict of guilt removes the presumption of innocence and replaces it with a presumption of guilt, and [on appeal] the defendant has the burden of illustrating why the evidence is insufficient to support the jury's verdict. Id.; State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982). "This [standard] applies to findings of guilt based upon direct evidence, circumstantial evidence, or a combination of direct and circumstantial evidence. State v. Pendergrass, 13 S.W.3d 389, 392-93 (Tenn. Crim. App. 1999).

Gene and Wendy Douglas testified that they had the opportunity to observe the Defendant for some time during the offenses. Within minutes of the 9-1-1 call, the Defendant fled from a vehicle and was apprehended by the police. Gene and Wendy Douglas' identification of the Defendant at the scene was unequivocal. We conclude that the absence of the Defendant's fingerprints at the scene or stolen property found in the Defendant's possession does not render the evidence insufficient. See, e.g., State v. Larry Payne, No. W2005-00679-CCA-R3-CD, 2006 WL 1506518 (Tenn. Crim. App. June 1, 2006), perm. app. denied (Tenn. Sept. 25, 2006). In the light most favorable to the State, the evidence sufficiently establishes the Defendant's identity as the perpetrator of the offenses. This issue is without merit.

*Sentencing*

The Defendant contends that the trial court did not properly find or weigh enhancement or mitigating factors in arriving at the length of the sentence imposed. Specifically, the Defendant contends that the trial court should have considered as mitigation that his conduct did not cause or threaten serious bodily injury and that he "clearly" lacked substantial judgment due to his age – under twenty years old at the time of sentencing. The

State argues that the sentences are consistent with the purposes and principles of the 1989 Sentencing Act and therefore, cannot be disturbed on appeal. Following our review, we agree with the State.

At the sentencing hearing, the trial court found, based upon his history of criminal convictions, that the Defendant qualified as a Range I, standard offender for the especially aggravated kidnapping conviction and as a Range II, multiple offender for the remaining convictions.[1] The trial court imposed a twenty year sentence for the especially aggravated kidnapping conviction and six year sentences for the attempted aggravated robbery and aggravated burglary convictions based upon the Defendant's history of criminal convictions and the fact that the Defendant was on probation at the time the offenses were committed. See Tenn. Code Ann. § 40-35-114(1) and (13). The trial court rejected all of the statutory mitigating factors and specifically found, relative to the Defendant's youth, that "this young man, very young man but also on probation for very serious offenses, he should have, certainly, substantial judgment to know not to commit any criminal offenses. I will not find [factor] number six." See Tenn. Code Ann. § 40-35-113(6). The record reflects that the Defendant was on probation for aggravated robbery, aggravated burglary, and misdemeanor theft at the time of the offenses. The trial court ordered the sentences to be served concurrently.

An appellate court's review of sentencing is de novo on the record with a presumption that the trial court's determinations are correct. Tenn. Code Ann. § 40-35-401(d). As the Sentencing Commission Comments to this section note, on appeal the burden is on the Defendant to show that the sentence is improper. This means that if the trial court followed the statutory sentencing procedure, made findings of fact that are adequately supported in the record, and gave due consideration and proper weight to the factors and principles that are relevant to sentencing under the 1989 Sentencing Act, the court may not disturb the sentence even if a different result were preferred. State v. Fletcher, 805 S.W.2d 785, 789 (Tenn. Crim. App. 1991); see also State v. Carter, 254 S.W.3d 335 (Tenn. 2008).

However, "the presumption of correctness which accompanies the trial court's action is conditioned upon the affirmative showing in the record that the trial court considered the sentencing principles and all relevant facts and circumstances." State v. Ashby, 823 S.W.2d 166, 169 (Tenn. 1991). In this respect, for the purpose of meaningful appellate review,

[T]he trial court must place on the record its reasons for arriving at the final

---

[1] The Defendant was previously convicted of aggravated burglary and misdemeanor theft occurring on June 18, 2006, and of aggravated robbery occurring on August 4, 2006. The felonies provide basis for his range enhancement.

sentencing decision, identify the mitigating and enhancement factors found, state the specific facts supporting each enhancement factor found, and articulate how the mitigating and enhancement factors have been evaluated and balanced in determining the sentence.

State v. Jones, 883 S.W.2d 597, 599 (Tenn. 1994) (citation omitted); see Tenn. Code Ann. § 40-35-210(e).

Tennessee's sentencing act provides:

(c) The court shall impose a sentence within the range of punishment, determined by whether the defendant is a mitigated, standard, persistent, career, or repeat violent offender. In imposing a specific sentence within the range of punishment, the court shall consider, but is not bound by, the following advisory sentencing guidelines:

> (1) The minimum sentence within the range of punishment is the sentence that should be imposed, because the general assembly set the minimum length of sentence for each felony class to reflect the relative seriousness of each criminal offense in the felony classifications; and
> (2) The sentence length within the range should be adjusted, as appropriate, by the presence or absence of mitigating and enhancement factors set out in §§ 40-35-113 and 40-35-114.

Tenn. Code Ann. § 40-35-210(c)(1)-(2).

The weight to be afforded an enhancement or mitigating factor is left to the trial court's discretion so long as its use complies with the purposes and principles of the 1989 Sentencing Act and the court's findings are adequately supported by the record. Id. § (d)-(f); Carter, 254 S.W.3d at 342-43. "An appellate court is therefore bound by a trial court's decision as to the length of the sentence imposed so long as it is imposed in a manner consistent with the purposes and principles set out in . . . the Sentencing Act." Carter, 254 S.W.3d at 346. As explained by our supreme court in Carter, the 2005 amendments to the Sentencing Act now afford the trial court such greater discretion that:

the trial court is free to select any sentence within the applicable range so long as the length of the sentence is 'consistent with the purposes and principles of the [Sentencing Act].'"

Carter, 254 S.W.3d at 343 (citing Tenn. Code Ann. § 40-35-210(d)). Accordingly, on appeal we may only review whether the enhancement and mitigating factors were supported by the record and their application was not otherwise barred by statute. See id.

In conducting its de novo review, the appellate court must consider (1) the evidence, if any, received at the trial and sentencing hearing, (2) the presentence report, (3) the principles of sentencing and arguments as to sentencing alternatives, (4) the nature and characteristics of the criminal conduct, (5) any mitigating or statutory enhancement factors, (6) any statement that the defendant made on his own behalf, (7) the defendant's potential for rehabilitation or treatment, and (8) any statistical information provided by the Administrative Office of the Courts as to sentencing practices for similar offenses in Tennessee. Tenn. Code Ann. §§ 40-35-102, -103, -210; see also Ashby, 823 S.W.2d at 168; State v. Moss, 727 S.W.2d 229, 236-37 (Tenn. 1986).

The record reflects that the trial court gave specific consideration to all sentencing considerations and principles, including each statutory mitigating factor and any enhancement factor proposed by the State. The trial court noted that there was a basis to impose consecutive sentences but declined to do so, in part, based upon its consideration that the previously probated sentences would be revoked and involve consecutive service. We agree with the trial court's determinations regarding enhancement and mitigating factors in this case. Furthermore, as previously noted, if the record reflects that the trial court imposed a sentence consistent with the principles and purpose of the Sentencing Act, this court may not disturb the trial court's sentencing decision. Accordingly, we conclude that the sentences in this case should be affirmed.

CONCLUSION

In consideration of the forgoing and the record as a whole, the judgments of the trial court are affirmed.

_____
D. KELLY THOMAS, JR., JUDGE

11