FILED

06/28/2017

Clerk of the
Appellate Courts

IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON
January 4, 2017 Session

## STEPHEN LYNN HUGUELEY v. STATE OF TENNESSEE

**Appeal from the Circuit Court for Hardeman County**
**No. CC-6665     J. Weber McCraw, Judge**

_____

**No. W2016-01428-CCA-R3-ECN**

_____

The Petitioner, Stephen Lynn Hugueley, was sentenced to death for the 2002 first degree premeditated murder of a prison counselor, Delbert Steed, while the Petitioner was housed at the Hardeman County Correctional Facility, following two prior first degree murder convictions for the shotgun slaying of his mother and the later killing of another inmate. See State v. Hugueley, 185 S.W.3d 356, 364 (Tenn. 2006). He filed a petition for writ of error coram nobis, alleging that his 2013 MRI, which showed that he had congenital brain defects, was "newly discovered evidence" that he was incompetent at the time of his 2003 capital trial, as well as in 2008 when he withdrew his petition for post-conviction relief. The coram nobis court concluded that the Petitioner had made an insufficient showing for the granting of relief. On appeal, the Petitioner argues that the court erred in this determination, asserting that, had his incompetency been known at the time of trial, no judgment of conviction would have been entered and that, as well, he had not been competent to waive the presentation of mitigating evidence at trial or to waive his right to utilize post-conviction procedures. Further, he argues that a relative may pursue, in his behalf, his petition for writ of error coram nobis. Following our review, we conclude that the Petitioner's claim of incompetency before and after his trial does not constitute "newly discovered evidence" and, further, that this claim was untimely. Accordingly, we affirm the order of the coram nobis court denying relief.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed**

ALAN E. GLENN, J., delivered the opinion of the court, in which JOHN EVERETT WILLIAMS and CAMILLE R. MCMULLEN, JJ., joined.

Amy Dawn Harwell and Kristen Marie Stanley, Assistant Federal Public Defenders, Nashville, Tennessee, for the appellant, Stephen Lynn Hugueley.

Herbert H. Slatery III, Attorney General and Reporter; Jeffrey D. Zentner, Assistant Attorney General; D. Michael Dunavant, District Attorney General; and Joe L. VanDyke and Mark E. Davidson, Assistant District Attorneys General, for the appellee, State of Tennessee.

## OPINION

## FACTS

Before setting out the complicated history of this matter, as well as the Petitioner's shifting and contradictory desires, we first note that the Petitioner has a history of taking actions which appear to be against his self-interest and later, in a series of petitions and motions and appeals, again visits the court system where he seeks to undo his earlier actions. In a previous proceeding, this court observed that the Petitioner appeared to have "a firm grasp of the legal process and the legal ramifications of his decisions." Stephen Lynn Hugueley v. State, No. W2009-00271-CCA-R3-PD, 2011 WL 2361824, at *41 (Tenn. Crim. App. June 8, 2011), perm. app. denied (Tenn. Dec. 13, 2011) (hereinafter "state post-conviction appeal"). Further, we noted the Petitioner's apparent "willingness to use his knowledge of the legal system to manipulate proceedings to further his own interests or agenda." Id. His petition for writ of error coram nobis, the denial of which is the basis for this appeal, appears to be an attempt to relitigate a previous finding by the courts that he was competent. On this latest foray into the court system, the Petitioner argues that the opinions of two new experts that he is presently incompetent and has been since before his 2003 trial constitute "newly discovered evidence," meaning that his conviction and sentence of death must be set aside. As we will explain, we agree with the error coram nobis court that these two later expert opinions are not "newly discovered evidence" and do not entitle the Petitioner to relief.

We note that in a parallel federal proceeding, reviewing issues very similar to those raised by this appeal, Chief Judge J. Daniel Breen concluded in 2015 that the Petitioner's chance of success in his state coram nobis proceeding, which is the basis for this appeal, was "minimal." Stephen Hugueley v. Wayne Carpenter, Warden, No. 09-1181-JDB-egb, 2015 WL 225053, at *20 (W.D. Tenn. Jan. 15, 2015) (hereinafter "federal habeas corpus action"). Much of the difficulty in writing this opinion is that the Petitioner's extensive psychiatric history was not set out in his coram nobis petition, other than in a report of one of the new mental health experts, Dr. George Woods, who criticized the prior examinations. However, the Petitioner's mental health history is set out in detail in the state post-conviction appeal and in the federal habeas corpus action, neither of which is revealed in either of the Petitioner's briefs filed in this matter. The state post-conviction appeal reviewed in 2011 the Petitioner's claim that he was incompetent to withdraw his 2008 post-conviction relief petition, while the federal habeas

corpus action considered essentially the same claims presented by this appeal. The Petitioner was unsuccessful in both of those actions.

We will set out the complicated history of this matter.

The Petitioner was convicted in 1986 of the first degree murder of his mother; in 1992 of the first degree murder of an inmate; in 1998 of criminal attempt to commit the first degree murder of a second inmate; and in 2003 of the first degree premeditated murder of Mr. Steed, whom he stabbed thirty-six times with a homemade knife, or "shank," in 2002. At his trial for the homicide of Mr. Steed, the Petitioner waived presenting a defense at the guilt phase or mitigating evidence at the sentencing phase.

This appeal concerns the Petitioner's conviction, and sentence of death, only for the 2002 murder of Mr. Steed. In the past, the Petitioner has been evaluated by a number of mental health professionals. Prior to his trial, he was examined by Dr. Keith Caruso, who found him competent to stand trial in 2003. Dr. Caruso's extensive examination is set out in great detail in Stephen Hugueley, 2015 WL 225053, at *3-5.

Following the Petitioner's MRI in 2013, two new mental health experts concluded, based on the MRI results, and contrary to all other experts who previously examined him, that the Petitioner had been incompetent to stand trial in the capital case a decade earlier, as well as later when he filed and subsequently withdrew his petition for post-conviction relief. The Petitioner views the two opinions of incompetency as "newly discovered evidence," which invalidate his third first degree murder conviction, sentence of death, and later withdrawal of his petition for post-conviction relief as to that conviction and sentence.

As to his seeking post-conviction relief, the Petitioner filed a pro se petition for post-conviction relief in 2008. Stephen Lynn Hugueley, 2011 WL 2361824, at *1. The post-conviction court appointed the Office of the Post-Conviction Defender to represent the Petitioner, and he then wrote the post-conviction court expressing his desire to withdraw his petition. A competency hearing was held in November 2008. On January 8, 2009, the post-conviction court found the Petitioner competent and entered an order dismissing the petition, as he had requested. A notice of appeal was filed on February 19, 2009, and this court affirmed the post-conviction court's determination. The Petitioner then filed a motion to remand the matter to the post-conviction court, predicated upon his new desire to proceed with any and all available challenges to his conviction and sentence. Id.

Apparently, while that appeal was pending, the Petitioner, arguing that trial counsel was ineffective, filed the federal habeas corpus petition in the United States

District Court for the Western District of Tennessee. Stephen Hugueley, 2015 WL 225053, at *1. Then, in November 2013, the Petitioner, through counsel, sought to amend his federal petition to include "claims relating to brain imaging." Id. at *17. In April 2014, this motion was denied, as was the Petitioner's request to hold in abeyance the federal claims, apparently to pursue in state court the brain imaging claims. With the federal habeas corpus matter still pending, the Petitioner next filed in the Circuit Court for Hardeman County a petition for writ of error coram nobis on September 26, 2014, citing the brain imaging claims as "newly discovered evidence." That court dismissed the petition on June 7, 2016, and this appeal followed.

To explain the Petitioner's extensive psychiatric history, we will set out a lengthy portion of his unsuccessful 2015 federal habeas corpus action, which, in turn, quoted portions of this court's 2011 opinion:

> Petitioner's competency has been addressed at various times in the state court. In 2003, prior to trial, neuropsychologist Pamela Auble conducted a records review and forensic neuropsychological evaluation of Petitioner at the request of counsel. (*See* ECF No. 43–2 at PageID 3433, 3447.) Auble concluded that he "had a history of psychiatric problems and severe behavioral problems" including socialization and impulse control, suicidal ideation and attempts, auditory hallucinations, depression, and aggression. (*Id.* at PageID 3454.) She noted "patchy impairments" from the neuropsychological testing. (*Id.* at PageID 3453.) Auble stated that a CT scan in 1987 did not reveal evidence of recurrence of a tumor that was removed from Petitioner's brain. (*Id.*) However, she recommended medical imaging of [Petitioner's] brain given the neuropsychological data, his "left arm/leg symptoms, and the frequent severe headaches." (*Id.*)

> In 2003, psychiatrist Keith Caruso evaluated Petitioner at the request of his attorney to form an opinion about Petitioner's competency to stand trial, mental state at the time of the offenses, and extenuating or mitigating factors for sentencing. (*See id.* at PageID 3457.) With regard to his competency, Caruso stated:

>> Despite a severe mental disease, Intermittent Explosive Disorder, the [Petitioner] understands the nature of the proceedings against him and the possible consequences and can cooperate intelligently with his attorney in his own defense in accordance with the criteria listed in *State v. Blackstock*. He accurately stated the charge against him as "first degree murder," and knew the date, victim, and location

-4-

of the allegation. He was aware that he could face the death penalty or life in prison without the possibility of parole, or life with the possibility of parole, although he acknowledged that, compounded with his earlier sentences, even the latter would amount to spending the remainder of his life in prison.

[Petitioner] identified his attorneys as Michie Gibson and T.J. Cross–Jones, stated that they "got along okay," and felt that they were adequately representing his interests. He identified Elizabeth Rice as the prosecutor who would present evidence against him. He recognized that his attorneys would not want him to make incriminatory statements to the prosecutor, although he had already done so in an effort to ensure that he is given the death penalty. [Petitioner] knew that the Judge was the Honorable Jon Kerry Blackwood and understood the Judge's role to be "to hear all the evidence and make rulings on objections and motions and instruct the jury, make sure Constitutional Rights aren't violated." He further acknowledged that the Judge was impartial.

[Petitioner] knew that the jury heard all evidence, deliberated, and decided issues of guilt or innocence and passed sentence in the event of a first degree murder conviction. He defined evidence as "proof of something," and stated that witnesses "verify the accuracy of events or provide scientific information, such as DNA or psychiatric opinions." He knew the possible please [sic] of guilty and not guilty and understood the concept of presenting an insanity defense, although he acknowledged that he did not "think that it would fly." He stated that at trial, "the prosecutor puts up evidence proving the defendant committed the crime, and the defense tries to rebut it. The jury is instructed and deliberates." He named potential outcomes as verdicts of "guilty and not guilty, as well as justifiable homicide or a lesser included offense." He stated that a guilty verdict on first degree murder would lead to a sentencing hearing where aggravators and mitigators would be presented to the jury, who would again deliberate and pass sentence.

[Petitioner] stated that he wanted to receive the death penalty. He initially stated, "I'm suicidal, I just ain't got the

guts to do it myself." He later corrected himself, saying that he was not suicidal, but did not care whether he lived or died under the current conditions. He further added, "I have no intention of living 30 or 40 years in prison." [Petitioner] stated that he did not believe that life ended at physical death, believing that there was an after-life. He stated that he imagined that he would go to hell if he did not change his ways. He was non-committal as to whether he would change his ways. [Petitioner] also stated that conditions at Unit 2, where he would likely be housed if given a death sentence, were in fact better than conditions had been at other facilities. While this may seem unusual, it is a sentiment that I have heard expressed by several other inmates.

[Petitioner] further added that he understood that, if given the death penalty, he would be executed by lethal injection. He acknowledged that he would have selected this method over electrocution, as that may have led to a more painful death.

[Petitioner] understands the nature of the proceedings against him on a factual and rational level. He also understands the possible consequences of those proceedings, specifically that he could face the death penalty or life in prison. [Petitioner's] current assertion that he wants to be convicted and receive the death penalty requires careful analysis to determine whether he has reached this stance rationally.

A key issue to examine in [Petitioner's] case is the distinction between rational and conventional. Under most circumstances, we would question the reasoning of someone who made efforts to engineer his own death. We must carefully safeguard to be certain that someone is not doing so out of mental illness, such as Major Depression, Bipolar Disorder, or Schizophrenia or some other psychotic disorder. [Petitioner] is not psychotic at this time. He does not suffer currently from delusions, hallucinations, or other forms of disorder in his thinking. He is not seeking to end his life as a means of ending some imagined suffering that is the irrational product of a delusion or hallucination.

Neither does [Petitioner] currently suffer from Major Depression or Bipolar Disorder. Depressed individuals often are so hopeless and tormented by their depression that they see suicide as the only means of escaping their intolerable pain. Conversely, an individual in the throes of a manic episode may be so grandiose as to believe that his death would not be permanent or would serve some other greater societal cause, such as saving the world. Manic individuals lack the insight to project themselves into the future and appreciate the ramifications of their impulsive decisions. In each of these cases, an individual may make an irrational decision that leads to his own death, failing to recognize that he is viewing the world in an irrationally distorted manner and in fact has a condition that may be alleviated by treatment.

[Petitioner's] assertion that he wants the death penalty is conditional. He stated that he would be happy to live as a free man and raise a family, although he recognizes that this is not an option for him. [Petitioner's] desire to be executed is also conditional in that it has arisen in the setting of frustration and thwarted desires. [Petitioner] is a man with little control over his environment. He is constitutionally a man who requires instant gratification; thus, his lack of control and the tedium of prison are difficult for him to tolerate. [Petitioner] never developed a sense that he could enact socially acceptable behavior that would lead to him receiving positive reinforcements. Instead, his life has been a series of disappointments, abandonment, broken promises, and frustration.

[Petitioner] realistically appreciates that his circumstances will not change. He feels that he cannot tolerate "30 to 40 more years in prison," seeing this as intolerable suffering. While there certainly is a significant degree of suffering involved, this could in no way justify changing his circumstances. He acknowledges that he has tried treatments with various antipsychotic, mood stabilizing, and antidepressant medications without effect, and he does not meet criteria for one of these conditions. While

-7-

conventionally most people would elect to preserve their lives even in prison without the possibility of parole, [Petitioner] is certainly unconventional. However, his reasoning is not irrational, given his unconventional personality and life's experience.

Finally, [Petitioner] is capable of cooperating with his attorneys in his own defense. At times, he has not chosen to do so; nevertheless, these are again unconventional choices, as opposed to choices driven by irrational delusional beliefs, psychotically disordered thinking, or hallucinations.

(ECF No. 43-2 at PageID 3466-3469.) Petitioner was considered to be competent stand trial in 2003.

[Petitioner] moved to withdraw his post-conviction petition after issues with his visitation were resolved. *See Hugueley v. State*, No. W2009-00271-CCA-R3-PD, 2011 WL 2361824, at *4-7 (Tenn. Crim. App. June 8, 2011). A competency hearing was held on November 14, 2008. *Id.* at *11. (See ECF No. 42–12.) The post-conviction court found Petitioner competent to waive post-conviction review and dismissed the petition in 2009. *Hugueley*, 2011 WL 2361824, at *16.

On appeal, the Tennessee Court of Criminal Appeals heard Petitioner's motion to remand the matter to the post-conviction court and the merits of the case contemporaneously. *Id.* at *1. In 2011, the court determined that Petitioner could not "belatedly withdraw his decision to dismiss his petition for post-conviction relief" and that the post-conviction court did not err in concluding Petitioner was competent. *Id.* at *1, *43.

The Tennessee Court of Criminal Appeals thoroughly reviewed issues related to Petitioner's mental health:

On August 1, 2008, the post-conviction court appointed Dr. Bruce Seidner to evaluate the Petitioner's competency.

During a competency hearing [on] November 14, 2008, Dr. Seidner, a licensed clinical psychologist, testified that he was appointed by the court in August 2008, to evaluate the Petitioner's competency to withdraw his petition

for post-conviction relief. Dr. Seidner reported that he met with the Petitioner on August 27 and 28, 2008. He utilized the PAI, which is a self-report inventory, and administered a test of malingering called the VIP. Dr. Seidner also administered the Wisconsin Card Sort Test and the Wechsler Adult Intelligent Scale, 3rd Edition. As a result of this testing, Dr. Seidner opined that the Petitioner "presents as really quite capable." Dr. Seidner determined that the Petitioner was not struggling with depression and talked about the Petitioner's self-responsibility and self-interests. Dr. Seidner concluded that there was no impairment of the Petitioner's capacity.

The Petitioner's counsel elicited responses from Dr. Seidner delineating the differences between a psychologist and a neuropsychologist. Dr. Seidner acknowledged that Dr. Pamela Auble was a neuropsychologist and had administered different tests during her evaluation of the Petitioner in 2003. Dr. Auble did not conclude that the Petitioner was not competent. Dr. Seidner noted, however, that while he was not a neuropsychologist, there was no trauma or brain disease evident from Dr. Auble's evaluation in 2003, which would necessitate the need for evaluation by a neuropsychologist in 2008.

Dr. Seidner related that, upon contacting Brushy Mountain on August 25, 2008, he was advised by the unit manager that the Petitioner refused to take any tests and requested no-contact visitation. Dr. Seidner explained that while he did meet with the Petitioner, they were separated by a glass partition. Dr. Seidner related that the Petitioner was operating at a fourth grade level. He also related that the Petitioner's score indicated a high risk for suicide. However, Dr. Seidner rejected any conclusion that the Petitioner was "extremely depressed and suicidal." While he conceded that he had noted that the Petitioner wanted to commit "suicide by State," Dr. Seidner also acknowledged that the Petitioner had stated that "he's not suicidal." Dr. Seidner explained the apparently-conflicting statements:

[Petitioner] does not want to live on death row. Suicide is an unfortunate and . . . rather permanent solution to a temporary problem. There are people who have a permanent problem and there's no solution. . . . He's been sentenced to death . . . and he has weighed his self[-]interests in terms of challenging this and what he would get, which is continued decline and a life on death row[,] which he has rejected. . . .

Dr. Seidner further noted that Dr. Keith Caruso made the distinction clear in his 2003 report when he discussed that the Petitioner was unhappy about his situation. Dr. Seidner acknowledged the Petitioner's history of contradictions and history with the criminal justice system. Dr. Seidner related that the Petitioner went to trial in 2003, rather than pleading guilty. The Petitioner then attempted to abandon his appeals. In 2005 and 2006, the Petitioner made statements that he was not filing a petition for post-conviction relief. In 2006, he made statements to the media that he was looking forward to his execution. He then filed a petition for post-conviction relief, which he later asked the judge to dismiss. Dr. Seidner described the Petitioner as dismissive of psychiatrists and psychologists. He stated that the Petitioner described himself as manipulative. Dr. Seidner conceded that the Petitioner's father committed suicide and that the Petitioner had a very dysfunctional childhood. Additionally, he acknowledged a history of mental illness in both his paternal and maternal family members.

Dr. Seidner reported that the Petitioner described his current living conditions as "sensory deprivation -- breaks people mentally and physically . . . it's torture." Dr. Seidner had no knowledge that another inmate in the Petitioner's unit had committed suicide and that only two other death row inmates were housed at Brushy Mountain. Dr. Seidner was questioned regarding the Petitioner's destruction of two television sets and treasured personal items. Dr. Seidner noted that this behavior was "not impulsivity;" rather, the actions were "egregious and dramatic manipulation." Dr. Seidner remarked that the Petitioner "knows exactly what he is doing."

-10-

Dr. Seidner acknowledged that on July 15, 1981, a report indicated that "[Petitioner] directs destructiveness to himself, head banging, cutting and low impulse control." He acknowledged that on January 15, 1983, when the Petitioner was fourteen years old, a report indicated that the Petitioner was transferred from one juvenile institution to another, noting that the Petitioner "attempts to inflict self[-]injury and self[-]mutilation." While a juvenile, the Petitioner was medicated with Mellaril, Haldol, Thorazine, Elavil, and Sinequan, all of which are classified as antidepressants. Dr. Seidner also acknowledged a psychiatric report from November 23, 1983, documenting at least two incidents of self[-]injurious behavior after which the Petitioner requested to be isolated. At this time, the Petitioner also indicated that he had huffed inhalants, had engaged in chronic substance abuse, heard voices telling him to do things, thought about suicide, and was depressed and angry. On December 9, 1983, the Petitioner was placed in medical isolation because he tried to hang himself twice with a sheet. At this time, the Petitioner reported family problems and that voices told him to kill his mother. In a report dated June 8, 1984, the Petitioner was certified as severely emotionally disturbed, a finding necessary to qualify for special education services. Four days later, following a disagreement with a girlfriend, the Petitioner was admitted to the hospital following ingestion of several pills with alcohol. On November 25, 1984, a report indicated at least six incidents of self-inflicted wounds resulting from the Petitioner's swallowing thumb tacks. Dr. Seidner acknowledged that the Petitioner was admitted to the hospital on February 26, 1986, and again on February 28, 1986, from overdoses of Sinequan. He noted, however, that the reports indicated that these overdoses were "not being anything more than a gesture and manipulative."

Dr. Seidner stated that a CAT scan of the Petitioner on July 25, 1986, revealed an osteolytic lesion on the right rear juncture of the frontal and temporal lobes. On October 31, 1986, the Petitioner was admitted to the Tennessee State Prison hospital with a history of recurrent auditory hallucinations. The Petitioner had surgery to remove the

-11-

tumor.  On February 23, 1987, the Petitioner complained of blackouts and weakness in his left arm and leg.

On August 16, 2007, Dr. Pamela Auble provided an affidavit in which she stated that she performed a neuropsychological evaluation of the Petitioner, as authorized by the trial court in 2003.  She noted that the Petitioner had a long history of psychiatric illness, including major depression, suicide attempts, and hallucinations.  Dr. Auble concluded that the Petitioner's ability to engage in abstract reasoning was variable.  She noted that a medical record indicated that a right frontal tumor was removed in 1986, without damage to the Petitioner's brain.  Due to symptoms in his left arm and leg and the Petitioner's self-report of frequent headaches, Dr. Auble recommended medical imaging of the brain to rule out a recurrence of the tumor.  Dr. Auble further noted that "[c]ompetency is not static, but rather a function of the individual's present state."  Dr. Auble concluded that she was unable to "venture an opinion on [Petitioner's] present competency" because she had not seen him in four years.

Dr. Seidner remarked that Dr. Auble did not state that the Petitioner lacked competence.  Rather, Dr. Auble noted that she observed signs that could potentially be a problem.  Dr. Seidner stated that Dr. Auble found a deficit in motor speed and finger tapping and related these deficits to the tumor which was removed.

. . . .

On August 20, 2007, Dr. Keith Caruso, through affidavit, stated that he evaluated the Petitioner in June 2003.  Dr. Caruso recommended a CT scan due to the removal of a tumor when the Petitioner was eighteen years old.  Dr. Caruso concluded that the Petitioner met the criteria for several disorders, including Intermittent Explosive Disorder.  Dr. Caruso added that the Petitioner suffers from instability in his relationships, affect, impulse control, anger modulation, and sense of personal identity.  The Petitioner has a history of suicidal ideation and self-injury and is prone to paranoid ideation and transient psychotic symptoms under stress.  The

competency of individuals such as this can wax and wane depending upon the circumstances. Dr. Caruso noted that he could not offer an opinion as to the Petitioner's present competency because he has not seen him in more than four years but stated that it would be prudent to reassess his current competency based upon prior evaluations.

On January 8, 2009, the post-conviction court entered an order dismissing the petition for post-conviction relief. The order reflected the procedural history of this matter, including the Petitioner's letters to the court expressing his desire to withdraw the petition for post[-]conviction relief. Specifically, the post-conviction court entered the following findings of fact and conclusions of law:

At an initial status hearing . . . this court inquired whether it was [P]etitioner's desire to persist with his motion to withdraw his post-conviction petition. Petitioner responded that he wished to forego any further appeal of his conviction and sentence and stated that he was aware of the consequences of his actions. Petitioner indicated that he never intended to pursue post[-]conviction review. He stated that he had consented to the filing of his post[-]conviction petition in order to allow him time to resolve problems he was having with his visitation rights at the prison. He stated that those matters had been resolved; thus, he no longer wished to move forward with the pending litigation.

Again, prior to the start of the actual hearing to determine if a "genuine issue" as to competency existed, the court again inquired whether [P]etitioner desired to withdraw his post-conviction petition and [P]etitioner again indicated his desire to withdraw the petition. . . . Petitioner's responses were coherent and showed not only a clear understanding of the post-conviction process; but, also demonstrated a remarkable ability to manipulate and bend the system to accommodate his needs and desires. . . .

. . . .

-13-

At the "genuine issue" hearing, counsel for [P]etitioner was permitted to present proof which she argued demonstrated there was a "genuine issue" as to [P]etitioner's competency to withdraw his post[-]conviction petition. . . . She informed the court that [P]etitioner had a history of mental illness and brain damage. . . . [She] did reveal an incident in March of 2007, where [P]etitioner was disciplined for smearing feces on the walls of his cell. . . .

. . . .

The court allowed the [P]etitioner to address counsel's assertions on the record and Petitioner indicated that he could produce witnesses who would testify that he is rational and could say that he has not changed his mind on the issue of withdrawing his post-conviction petition. With regard to the incident alluded to by [Petitioner's counsel] regarding [P]etitioner being disciplined for smearing feces on the walls of his cell, [P]etitioner explained that such action was a form of protest over what he and other inmates perceived as mistreatment by the guards. . . . He claimed his actions were a form of civil disobedience aimed at forcing changes in prison policy. . . .

. . . .

. . . [T]his court found . . . a genuine issue existed as to whether [P]etitioner is competent to withdraw his post-conviction petition. . . . Thus, pursuant to Rule 28, this court ordered the parties to submit a list of mental health experts who could perform a timely evaluation of the [P]etitioner's present competence.

The post-conviction court related that the court appointed Dr. Hutson, a clinical psychologist, and Dr. Brown, a psychiatrist, to evaluate the Petitioner for competency. Dr. Hutson timely submitted a report in which he indicated that he found the Petitioner was competent to waive post-

conviction review. The court later learned that Dr. Hutson had mistakenly been compensated with funds from the Tennessee District Attorney General's Conference. Although the court found the State made no attempt to influence Dr. Hutson's opinion, the court ruled that Dr. Hutson's report would be disregarded. Dr. Brown failed to begin the evaluation six months after appointment and indicated that he would need an additional seven months. In light of the delay, the court appointed Dr. Seidner to evaluate the Petitioner. Dr. Seidner found the Petitioner competent to withdraw his petition for post[-]conviction review. Notwithstanding, "out of an abundance of caution," the post-conviction court scheduled an evidentiary hearing as to competency of the Petitioner.

. . . .

The post[-]conviction court continued to provide a summary of the Petitioner's medical and psychiatric history relating that:

At the age of ten, [P]etitioner set his house on fire and was evaluated by mental health professionals of Northwest Tennessee Mental Health Center. While in juvenile custody, the [P]etitioner's I.Q. was evaluated and he was found to have a full scale I.Q. of 78. Three years later, Petitioner was diagnosed as "socialized aggressive". . . . In 1983, he was given the Stanford-Binet I.Q. test and was found to have an I.Q. of 77. Later that year, he was evaluated by Tom Biller, Ed.D. . . . Biller found [P]etitioner has "deeply rooted antisocial tendencies." In 1986 the [P]etitioner killed his mother and was diagnosed with "sociopathic personality disorder." He was later referred to Midtown Mental Health Institute (MTMHI), where he was found competent to stand trial.

In August of 1986 doctors discovered a benign tumor on the right side of [P]etitioner's skull. At the same time, [P]etitioner was diagnosed with substance abuse and antisocial personality disorder. Notes from

-15-

MTMHI indicate that the "CT abnormality had nothing to do with [Petitioner's] thinking." Later in 1986, the [P]etitioner had surgery to remove the tumor in his front/parietal bone. Notes from Meharry Hubbard Hospital indicate that follow up testing revealed a small tumor in the right posterior bone[;] however, [P]etitioner refused further surgery. A later EEG showed normal functioning and "no evidence of brain damage." Additionally, a later CT scan was negative for tumor.

Tennessee Department of Correction records indicate that the Petitioner has been previously diagnosed with intermittent explosive disorder and antisocial/narcissistic personality disorder. In January of 2002, [P]etitioner killed a prison counselor. In 2003 . . . Petitioner was evaluated by Pamela Auble, a clinical neuropsychologist. Dr. Auble found that [P]etitioner's "estimated intelligence fell within the average range." . . . Dr. Auble indicated that she had ruled out depressive disorder and psychotic disorder. However, she found [P]etitioner may be suffering from antisocial personality disorder and indicated she could not rule out borderline personality disorder. Finally, Dr. Auble found [P]etitioner had no "widespread compromise in functioning." . . . Her reports indicate that, at the time, [P]etitioner had a full scale IQ of 98. She noted that "the tumor that was removed in 1986 . . . without damage to the brain."

During this period, [P]etitioner was also evaluated by Dr. Keith Caruso, a clinical psychologist. . . . [I]n 1995, [P]etitioner was diagnosed with Delusional Disorder, Persecutoriy [sic] Type. . . . Dr. Caruso states that he found the [P]etitioner's thought processes "were linear, logical and goal-directed." . . . Dr. Caruso stated that the [P]etitioner later indicated that he was not suicidal; but, had "no intention of living 30 to 40 years in prison." Dr. Caruso found "no evidence of delusions or perceptual disturbance." . . .

Dr. Caruso concluded that the [P]etitioner suffered from Intermittent Explosive Disorder, which he described as "a severe mental disease;" however, he found the [P]etitioner was competent to stand trial.

Based upon this evidence, the court declined to find that the Petitioner's then-current comments or desires indicated that he suffered from a mental disease or defect in the form of chronic severe depression. In addition, the court did not conclude that the Petitioner was suicidal or suffered from some other disorder or defect that might affect his ability to make a rational choice to withdraw from further post-conviction review of his conviction and sentence. The court continued to find that:

Even if this court were to find [P]etitioner does indeed suffer from a mental disease or defect either in the form of chronic, severe depression; brain abnormality or injury; or some other psychological malady, because this court finds that such mental disease or defect does not prevent [P]etitioner from understanding his legal position, the court would nonetheless find [P]etitioner is competent to withdraw his post[-]conviction petition.

. . . [T]his court finds [P]etitioner has a broad grasp of the legal ramifications of his decision. [T]he [P]etitioner has demonstrated a detailed understanding of the sentence he faces, the ramifications of withdrawing his current petition for post-conviction relief, and the legal procedures associated with such a decision.

The lower court further noted that the "[P]etitioner appears particularly adept at manipulating the system to suit his purpose. Thus, his choices appear both cogent and rational." Finally, the lower court determined that "even if it were to presume [P]etitioner suffers from some mental disease or defect, any such affliction has not compromised [P]etitioner's ability to make a rational choice amongst the legal options available to him."

-17-

Hugueley, 2011 WL 2361824, at *10-16 (some alterations in original).

The Tennessee Court of Criminal Appeals noted that, in 2008, Petitioner "consistently expressed a desire to withdraw his post-conviction petition" and drafted coherent, "extremely articulate and meticulously thought-out" pro se pleadings. *Id.* at *27. He asserted in the post-conviction process that Hutson had found him competent and that "finding should suffice." *Id.*

Seidner concluded that Petitioner suffered from antisocial personality disorder. *Id.* at *40. However, he determined that the disorder did not affect Petitioner's understanding of his legal position:

> [Petitioner] has no mental disease or defect that prevents him from understanding his legal position and options. His mental status and performance on objective measures of intelligence, executive decision[-]making capacity, and personality testing demonstrate his rationality and high level of flexible cognition that is not distorted by affect. He fully appreciates his position and makes rational choices with respect to abandoning further litigation.

*Id.* Seidner addressed whether Petitioner was able to make a rational choice amongst his legal options:

> There is no observable or measurable impairment in [Petitioner's] rational process as it relates to his functioning in this litigation. He has the demonstrated capacity to make rational, pertinent, and reasoned decisions. He fully understands and anticipates the consequences of these decisions from both a personal and legal perspective.

*Id.* at *41.

The Tennessee Court of Criminal Appeals opined:

> The records in the present case and in the Petitioner's direct appeal indicate that the Petitioner has a firm grasp of the legal process and the legal ramifications of his decisions. The record further demonstrates the Petitioner's willingness

-18-

to use his knowledge of the legal system to manipulate proceedings to further his own interests or agenda. The Petitioner is currently serving a death sentence and two life sentences under severe prison restrictions because of his violent history. The post-conviction court's determination of competency is supported by the fact that the Petitioner arrived at the competency hearing with a presumption that he was competent. This presumption was bolstered by previous determinations of competency. The record reflects that the post-conviction court had no doubt as to the Petitioner's competency but merely ordered the evaluation out of an abundance of caution with consideration of the severity of the proceedings. With consideration of the evidence and the applicable standard of review, we conclude that sufficient basis exists to support the lower court's finding that the Petitioner is competent to withdraw his petition for post-conviction relief.

Stephen Hugueley, 2015 WL 225053, at *2-12.

The basis for the Petitioner's latest foray into the state court system is a September 17, 2014 letter from Dr. George Woods who opined that the Petitioner was incompetent at each stage of the proceedings, his trial, his withdrawal of his petition for post-conviction relief, and at the present time. That letter concludes with the opinion of Dr. Woods:

[The Petitioner] has multiple neurological and neuropsychiatric symptoms, including affective dysregulation, impaired registration, defective problem initiation, impaired judgment, clinical perseveration, poor problem sequencing, grandiosity, irritability, agitation, flight of ideas, and circumstantiality. These symptoms are associated with neurological disorders. The etiology of these disorders is complex and interconnected, creating a depth of impaired functioning and disruptive behavior greater than would be predicted from any one disorder independently. The multiplicity of symptoms explains [the Petitioner's] atypical presentation and behavioral dysfunction.

Moreover, [the Petitioner's] symptoms are interrelated in a cognitive synergy that rendered him unable to function effectively as both an adolescent and an adult. [The Petitioner] is irrational, impulsive, and seemingly unable to effectively and consistently control his behavior. [The

-19-

Petitioner's] irrational behavior is long-standing, long pre-dating his trial on the instant case. His limitations rendered him incompetent to stand trial: his "impaired sense of reality substantially undermine[d] his judgment and prevent[ed] him from cooperating rationally with his lawyer." [The Petitioner] was also incompetent to waive post-conviction as his brain defect substantially affected his capacity to "appreciate his position and make a rational choice with respect to continuing or abandoning further litigation."

Id. at *2.

We note that both the 2011 state post-conviction appeal and the 2015 federal habeas corpus action include lengthy discussions of the opinions of Dr. Keith Caruso, who examined the Petitioner in 2003 and submitted an affidavit in 2007, and Dr. Bruce Seidner, who examined the Petitioner in 2008, as well as other mental health professionals. Accordingly, we will incorporate the findings and conclusions of those cases in our analysis of the present appeal.

## ANALYSIS

As we have set out, the Petitioner's claims are that he is entitled to coram nobis relief because of "newly discovered evidence" that he was incompetent both at the time of his trial and when he was allowed to withdraw his petition for post-conviction relief. The State responds that his petition is untimely and that a coram nobis petition may not be utilized to challenge competency to stand trial or to withdraw a post-conviction petition. As we will explain, we agree with the State.

A writ of error coram nobis is an "extraordinary procedural remedy," filling only a "slight gap into which few cases fall." State v. Mixon, 983 S.W.2d 661, 672 (Tenn. 1999) (citation omitted). Tennessee Code Annotated section 40-26-105(b) provides that coram nobis relief is available in criminal cases as follows:

The relief obtainable by this proceeding shall be confined to errors dehors the record and to matters that were not or could not have been litigated on the trial of the case, on a motion for a new trial, on appeal in the nature of a writ of error, on writ of error, or in a habeas corpus proceeding. Upon a showing by the defendant that the defendant was without fault in failing to present certain evidence at the proper time, a writ of error coram nobis will lie for subsequently or newly discovered evidence relating to matters which were litigated at the trial if the judge determines that such

-20-

evidence may have resulted in a different judgment, had it been presented at
the trial.

Our supreme court has stated the standard of review is "whether a reasonable basis exists for concluding that had the evidence been presented at trial, the result of the proceedings might have been different."  State v. Vasques, 221 S.W.3d 514, 525-28 (Tenn. 2007) (citation omitted).[1]  "If the defendant is 'without fault' in the sense that the exercise of reasonable diligence would not have led to a timely discovery of the new information, the trial judge must then consider both the evidence at trial and that offered at the coram nobis proceeding in order to determine whether the new evidence may have led to a different result."  Id. at 527-28.  The decision whether to grant or deny a petition for writ of error coram nobis on its merits rests within the sound discretion of the trial court.  Harris v. State, 301 S.W.3d 141, 144 (Tenn. 2010) (citing Vasques, 221 S.W.3d 514 at 527-28).  "A court abuses its discretion when it applies an incorrect legal standard or its decision is illogical or unreasonable, is based on a clearly erroneous assessment of the evidence, or utilizes reasoning that results in an injustice to the complaining party."  State v. Wilson, 367 S.W.3d 229, 235 (Tenn. 2012).

Petitions for writ of error coram nobis are subject to a one-year statute of limitations.  Tenn. Code Ann. § 27-7-103; Harris, 301 S.W.3d at 144.  The one-year statute of limitations may, however, be tolled on due process grounds if the petitioner seeks relief based upon newly discovered evidence of actual innocence.  Wilson, 367 S.W.3d at 234.  In determining whether tolling is proper, the court must balance the petitioner's interest in having a hearing with the State's interest in preventing a claim that is stale and groundless.  Harris, 301 S.W.3d at 145 (citing Workman v. State, 41 S.W.3d 100, 102 (Tenn. 2001)).  Generally, "before a state may terminate a claim for failure to comply with . . . statutes of limitations, due process requires that potential litigants be provided an opportunity for the presentation of claims at a meaningful time and in a meaningful manner."  Burford v. State, 845 S.W.2d 204, 208 (Tenn. 1992).  The Burford rule consists of three steps:

> (1) determine when the limitations period would normally have
> begun to run;

> (2) determine whether the ground for relief actually arose after the
> limitations period would normally have commenced; and

---

[1] We note that Vasques appears to use, interchangeably, the phrase "different judgment," as set out in the coram nobis statute, with the phrase "different result."  While these phrases appear to have the same, or nearly so, meaning, we will use the statutory phrase in this opinion.

-21-

(3) if the grounds are "later-arising," determine if, under the facts of the case, a strict application of the limitations period would effectively deny the petitioner a reasonable opportunity to present the claim.

Sands v. State, 903 S.W.2d 297, 301 (Tenn. 1995).  Whether a claim is time-barred is a question of law, which we review de novo.  Harris, 301 S.W.3d at 145 (citation omitted).

As we will explain, the petition for writ of error coram nobis, which is the basis for this appeal, has several fatal flaws.  First, it is untimely by a number of years.  Secondly, while the Petitioner denotes the additional information regarding his mental status as "newly discovered evidence," it simply is a matter of his locating two mental health experts who disagree with the previous experts who examined the Petitioner at length, both prior to his trial and his being allowed to withdraw his post-conviction petition.  Further, the new opinions that the Petitioner was not competent either at the time of trial or at the time of withdrawal of his post-conviction petition would not result in a different judgment, as required by Tennessee Code Annotated section 40-26-105(b).  Rather, because of his incompetency, no judgment would have been entered.

## A.  Timeliness of Petition

Both in the coram nobis court and on appeal, the State argues that the petition for coram nobis relief was untimely, because it was not filed within one year of the challenged judgment's becoming final, as required by Tennessee Code Annotated section 27-7-103.  The Petitioner responds that his petition was timely because it was filed within one year of the discovery of his brain abnormalities, which had rendered him incompetent ten years earlier, when he was tried.

In Wilson, our supreme court explained that the one-year statute of limitations for coram nobis petitions is waived for those asserting actual innocence established by the newly discovered evidence:

The one-year statute of limitations for a petition for writ of error coram nobis may be tolled on due process grounds if a petition seeks relief based upon newly discovered evidence of actual innocence.  Harris, 301 S.W.3d at 145 (citing Workman v. State, 41 S.W.3d 100, 101 (Tenn. 2001)).  In determining whether tolling of the statute is proper, the court is required to balance the petitioner's interest in having a hearing with the interest of the State in preventing a claim that is stale and groundless.  Harris, 301 S.W.3d at 145 (citing Workman, 41 S.W.3d at 103).  Generally, "before a state may terminate a claim for failure to comply with . . . statutes of limitations, due process requires that potential litigants be provided an

-22-

opportunity for the presentation of claims at a meaningful time and in a meaningful manner." Burford v. State, 845 S.W.2d 204, 208 (Tenn. 1992).

367 S.W.3d at 234.

The time period for seeking coram nobis relief began to run on January 2, 2004, which was thirty days after the trial court denied the Petitioner's motion for a new trial. Stephen Lynn Hugueley, No. W2004-00057-CCA-R3-CD, 2005 WL 645179, at *5 (Tenn. Crim. App. Mar. 17, 2005), aff'd, 185 S.W.3d at 364. Accordingly, the Petitioner's window to seek coram nobis relief expired on January 2, 2005. Because his petition was not filed until September 26, 2014, it was untimely by a number of years, unless his right to due process requires that the statute of limitations be tolled. We will apply the Burford test to determine if this is the case.

Initially, we note that, although evidence of the Petitioner's brain scan became available on September 27, 2013, he waited until nearly the last possible moment, September 26, 2014, to file his coram nobis petition. Previously, this court has observed that the Petitioner "manipulate[s] proceedings to further his own interests or agenda," Stephen Lynn Hugueley, 2011 WL 2361824, at *41, and that he "orchestrated delays," Stephen Hugueley, 2015 WL 225053, at *18. Additionally, the Petitioner is not claiming that he is innocent of the homicide, rather, that he was not competent to stand trial. As our supreme court explained in Payne v. State, 493 S.W.3d 478, 483 (Tenn. 2016), "a capital defendant's intellectual disability does not render him actually innocent of the death penalty offense." The Petitioner's mental problems were recognized and documented long before his trial. Prior to the trial, he was determined to be competent for that proceeding. He does not have a valid due process claim requiring tolling because he is not contending he is actually innocent of the crime. Rather, the Petitioner's claim is that no judgment at all should have been entered against him because of his mental incompetency.

As evidence that the present claims of the Petitioner are not "late arising," Chief Judge Breen noted that "Petitioner has had mental health issues since childhood, and the record is replete with evaluation of his mental health status and information related to his brain tumor. The record also indicates Petitioner's unwillingness to be evaluated for competency in the state court proceedings." Stephen Hugueley, 2015 WL 225053, at *16. We agree and conclude that the Petitioner's claim of incompetency is not "late arising" but, simply, a repackaging of his longstanding mental health problems combined with locating two expert witnesses to assert that the previous evaluations, concluding that the Petitioner was competent, were deficient.

-23-

Accordingly, we conclude that there is no basis for tolling of the statute of limitations for seeking coram nobis relief and that, as a result, the petition was untimely.

## B. Newly Discovered Evidence

In the error coram nobis petition, filed on the Petitioner's behalf by his aunt, the Petitioner relies upon the determinations of two mental health experts, who based their opinions on the results of his 2013 MRI, which showed abnormal brain development. Dr. George Woods opined that, because of his mental disease or defect, the Petitioner was unable to consult with his trial lawyer with a reasonable degree of rational understanding. In the opinion of Dr. Woods, the Petitioner's brain defects "undermine[d] his judgment and his ability to rationally cooperate with counsel." Dr. Woods diagnosed the Petitioner as having a major neurocognitive disorder and bipolar disorder due to a medical condition.

By letter dated September 16, 2014, Dr. Erin Bigler, a neuropsychologist, stated that, based upon the Petitioner's 2013 MRI, the Petitioner had a "reduced hyppocampal volume and increased size of the temporal horn," findings which suggested that the temporal lobe regions of his brain deviated from typical size. However, Dr. Bigler did not provide an opinion as to the competency of the Petitioner.

In a May 28, 2015 addendum to his November 26, 2014 letter, Dr. Siddhartha Nadkarni, Assistant Professor of Neurology and Psychiatry at the NYU School of Medicine, stated that he examined the Petitioner on April 22, 2015, and opined:

> These functions of the frontal lobes are critical in "consulting with one's lawyer with a reasonable degree of rational understanding" as required by Dusky [v. United States, 362 U.S. 402 (1960)]. [The Petitioner's] understanding is inherently irrational as he cannot properly process external and internal cues. That is to say, because of his brain malformation, [the Petitioner's] capacity to rationally understand the proceedings is compromised. This applies to the "rational as well as factual understanding of proceedings against him" as well; his actions are impulsive and reactionary as a result of his brain dysfunction and his cognitive impairments. In my opinion, [the Petitioner] is incompetent under the Dusky standard because of these impairments.

We note that while the coram nobis petition included, as exhibits, records of the Petitioner's behavioral problems dating back to at least 1980, it did not include, other than brief criticisms, reports regarding the extensive earlier examinations of the

-24-

Petitioner, which concluded that he was competent both to stand trial and later withdraw his post-conviction petition.

In the federal habeas corpus action, Chief Judge Breen concluded that the claims the Petitioner made, in part relating to his "competency, mental state, social history and intellectual capacity," were untimely because they had not been presented "from the date on which the factual predicate of the claim or claims presented could have been discovered through the exercise of due diligence." Stephen Hugueley, 2015 WL 225053, at *17-18. As the court explained, "[a]lthough the brain imaging conducted in September 2013 may have provided additional information in support of Petitioner's claims," the allegations . . . did not rely on a new factual predicate." Id. at *18. The court further observed:

> As evidenced by the Tennessee Court of Criminal Appeals' decision in 2011, [the Petitioner's] mental health and competency including issues of brain damage have been present in Petitioner's cases for some time. See Hugueley v. State, No. W2009-00271-CCA-R3-PD, 2011 WL 2361824, at *13-14, 18, 36-43 (Tenn. Crim. App. June 8, 2011). Petitioner also presented claims that were substantially similar in his prior motion to amend the petition, and these claims were determined to be time barred.

Id.

We agree with this determination by Chief Judge Breen. It was well documented that the Petitioner had serious behavioral problems. Mental evaluations before his 2003 trial concluded that he was competent to be tried for first degree premeditated murder. Later examinations to determine whether he was competent to withdraw his post-conviction petition resulted in the same finding, that he was competent to do so. This current appeal merely present different opinions, long after the fact, that he was incompetent then and even at the time of his 2003 trial. In both his coram nobis petition, as well as in this appeal, the Petitioner virtually ignores the previous detailed findings of mental health experts that he was competent. The coram nobis statute is intended to provide relief from what may have been an injustice, not to reward a petitioner who has been successful in his search to find new experts who disagree with the previous experts involved in the matter. Thus, this petition fails for that reason as well.

### C. Merits of Coram Nobis Petition

The Petitioner's claim that he is entitled to coram nobis relief is faulty for several reasons. First, Tennessee Code Annotated section 40-26-105(b) makes such relief available only to "newly discovered evidence relating to matters which were litigated at

-25-

the trial." Determinations as to a defendant's competency to stand trial are made by the trial court prior to the trial and are not submitted to the jury. Thus, the incompetency claims presented by the Petitioner would not have been litigated during the trial and cannot be the basis for coram nobis relief. Such relief may be granted only for newly discovered evidence that "may have resulted in a different judgment, had it been presented at the trial." Id. In fact, if the Petitioner had been determined by the trial court to be incompetent to stand trial, no judgment at all would have been entered. Rather, the court would have followed the procedures set out in Tennessee Code Annotated section 33-7-301 regarding possible hospitalization of an incompetent defendant. See State v. Bailey, 213 S.W.3d 907, 911-12 (Tenn. Crim. App. 2006). Since no judgment is not a "different judgment," the Petitioner seeks relief which is not available through a coram nobis action. Another hurdle which the Petitioner cannot overcome is the requirement that the "newly discovered evidence" would be admissible in a retrial of the matter. Newsome v. State, 995 S.W.2d 129, 135 (Tenn. Crim. App. 1998). As the coram nobis court explained: "[E]vidence relating to [the Petitioner's] competency to stand trial or waive sentencing would not have been admissible" at a trial. For this additional reason, the Petitioner's claim is deficient.

## D. Filing of Petition by Next Friend

As for whether a relative of the Petitioner may maintain this action, the coram nobis court concluded that it would be allowed for the limited purpose of this petition. On appeal, the State does not object to this arrangement, and the record on appeal is not sufficient for us to conclude otherwise. In view of this, we, likewise, will allow the procedure for the limited purpose of this appeal.

## CONCLUSION

Based upon the foregoing authorities and reasoning, we affirm the judgment of the coram nobis court.

_____
ALAN E. GLENN, JUDGE